# United States Court of Appeals
## For the First Circuit

---

Nos. 14-1089
14-1091

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN BRAVO-FERNANDEZ and HECTOR MARTÍNEZ-MALDONADO,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

---

Before

Howard, Lipez, and Barron,
Circuit Judges.

---

Martin G. Weinberg, with whom David Z. Chesnoff, Chesnoff & Schonfeld, and Kimberly Homan were on brief, for appellant Juan Bravo-Fernandez.
Abbe David Lowell, with whom Christopher D. Man and Chadbourne & Park LLP were on brief, for appellant Hector Martínez-Maldonado.
Vijay Shanker, United States Department of Justice, Criminal Division, Appellate Section, with whom Leslie R. Caldwell, Assistant Attorney General, David A. O'Neil, Acting Deputy Assistant Attorney General, and Peter M. Koski, United States Department of Justice, Criminal Division, Public Integrity Section, were on brief, for appellee.

June 15, 2015

**BARRON, Circuit Judge.** This appeal raises important and, in our Circuit, novel issues about when an acquittal in an earlier trial may be deemed to bar, under the Double Jeopardy Clause, a new prosecution on a related offense. The legal issues arise in connection with the federal bribery prosecutions of a former member of the Puerto Rico Senate and of the former president of a Puerto Rico private security firm.

We last considered these prosecutions two years ago following a trial at which the defendants had been convicted of federal program bribery under 18 U.S.C. § 666. See United States v. Fernandez, 722 F.3d 1 (1st Cir. 2013). At that time, we vacated the convictions because the jury had received improper instructions about what constituted "bribery" under that statute. Id. at 18-27. We thus remanded for a possible new trial based on a proper theory of liability under § 666. Id.

In this appeal, the defendants contend that the new trial may not begin because the renewed prosecutions violate the Double Jeopardy Clause, which provides that "[n]o person [may] be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. In pressing this contention, the defendants make two arguments.

The defendants first argue that the Double Jeopardy Clause bars the renewed prosecutions because the jury acquitted on closely related offenses in the earlier trial and, in doing so,

necessarily found that the government failed to prove issues that the government would have to relitigate in the new prosecutions. Separately, the defendants contend that the Double Jeopardy Clause bars the renewed prosecutions because a line order that the District Court issued and then corrected days after we issued our mandate in the last appeal constituted a final and irrevocable order of acquittal on the renewed § 666 charges.

The District Court rejected both double jeopardy arguments, and so do we. We thus affirm the District Court.

## I.

For purposes of the issues before us in this appeal, it is the procedural history of the case that matters most. And so we provide the relevant details of that history here.

The § 666 charges are based on a trip from Puerto Rico to Las Vegas that defendant Juan Bravo-Fernandez took with defendant Hector Martínez-Maldonado in May of 2005. The two men had traveled to Las Vegas to see boxer "Tito" Trinidad fight boxer "Winky" Wright. At the time, Bravo was the president of Ranger American, a private security firm in Puerto Rico. Martínez was a member of the Puerto Rico Senate.

A grand jury indicted the defendants in June of 2010, finding probable cause for the government's allegations concerning the connection between Bravo's payment for the trip and Martínez's support for legislation beneficial to Bravo's company. The

-4-

indictment contained a number of distinct counts. These counts included violations of the federal program bribery statute, 18 U.S.C. § 666, violations of the Travel Act, 18 U.S.C. § 1952(a)(3)(A), and conspiracy, 18 U.S.C. § 371.

The Travel Act prohibits travel in interstate commerce for a criminal purpose, 18 U.S.C. § 1952(a)(3)(A). In this instance, the government alleged that the criminal purpose was both to commit the bribery that § 666 prohibits and to violate Puerto Rico bribery law.[1] The predicate offenses for the conspiracy counts were the Travel Act (in furtherance of, according to the indictment, violations of § 666 and Puerto Rico bribery law) and § 666.

After a three week trial in 2011, the jury returned split verdicts as to each defendant. The jury convicted each defendant of federal program bribery under § 666. The jury acquitted each defendant of conspiracy to violate § 666 and of violating the Travel Act in furtherance of violating § 666. In addition, the jury convicted Bravo of two other offenses: conspiring to violate the Travel Act in furtherance of (according to the verdict form[2]) unspecified "racketeering" activity, and violating the Travel Act in furtherance of violating Puerto Rico bribery law. The jury

---

[1] See P.R. Laws Ann. tit. 33 §§ 4360, 4363 (repealed 2005).

[2] Unlike the indictment, the verdict form did not specify § 666 and Puerto Rico bribery law as the predicate offenses for the conspiracy to violate the Travel Act charges.

acquitted Martínez of those last two offenses.  The defendants appealed each of the convictions.

In Fernandez, we considered the defendants' appeal and reversed or vacated all of the convictions.  Fernandez, 722 F.3d at 39.  We reversed those of Bravo's convictions that were based on Puerto Rico bribery law as predicate offenses.  We did so because we held that those bribery laws had been repealed before Bravo had committed the relevant acts underlying the convictions.  Id. at 28-34.

We also vacated Bravo's and Martínez's convictions on the standalone § 666 counts.  Id. at 27.  Specifically, we concluded that § 666 required the government to prove that Bravo had paid for Martínez's trip to the boxing match "in exchange for" the future actions that Martínez allegedly took with respect to the legislation favoring Bravo's company.  Id. at 19.  We concluded, however, that the jury instructions allowed the jury to find a violation of § 666 even if the government failed to prove this "exchange" theory and instead proved only what we called a "gratuity" theory.  Id. at 26-27.  Under this improper gratuity theory, the government needed only to prove that Bravo had given, and Martínez had received, "a reward for" having already supported the two bills that favored Bravo's company.  Id. at 20.

After holding that the jury instructions were improper in this respect, we further concluded that the evidence supported not

only the correct exchange theory but also the improper gratuity theory.  Id. at 26-27.  We thus held that the error in the jury instructions was not harmless.  Id.  On that basis, we vacated the convictions on the standalone § 666 counts.  Id. at 27.  We then remanded for possible re-prosecution of the standalone § 666 counts under that same indictment.  Id. at 27-28.  In doing so, we explained that "[t]he government may not pursue a conviction" for the § 666 counts on a gratuity theory "if [d]efendants are retried."  Id. at 28.

Our mandate in Fernandez issued on October 23, 2013.  The District Court assumed jurisdiction once again.  Two days later, on October 25, unprompted by any party, the District Court entered a line order.  That line order stated:

> ORDER re 639 U.S.C.A. Judgment and 640 U.S.C.A. Judgment as to Juan Bravo-Fernandez and Hector Martinez-Maldonado.  The mandate having been issued (Docket No. 641), in accordance with the Judgments of the Court of Appeals (Docket Nos. 639 and 640), a judgment of acquittal shall be entered as to defendant Martinez's conspiracy count, as to defendant Bravo's conspiracy conviction, and as to both defendants' section 666 convictions.  Signed by Judge Francisco A. Besosa on 10/25/2013.

Within hours, the government filed an emergency motion "to clarify" the District Court's line order.  The government contended in that motion that the last clause of the line order was mistaken.  The government explained -- correctly, all parties to this appeal agree -- that this Court's opinion in Fernandez, in

-7-

vacating the standalone § 666 convictions, "did not order [the District Court] to enter a judgment of acquittal on the § 666 convictions."

Less than three hours after entry of the initial line order, and following the receipt of the government's motion, the District Court vacated that order. The District Court's new order specified that "[t]he defendants' section 666 convictions are VACATED."

The defendants then moved to "reinstate" the by-then vacated line order. The defendants argued that the line order constituted a judgment of acquittal that, given the Double Jeopardy Clause, could not be taken back. But the District Court disagreed and denied the motion.

Shortly thereafter, the defendants filed a new motion for acquittal on the standalone § 666 charges. In this motion, the defendants focused on the split jury verdicts. The defendants contended that, under the Double Jeopardy Clause, the acquittals of the defendants for conspiracy to violate § 666 and for violating the Travel Act in furtherance of a § 666 offense precluded any renewed prosecution on the standalone § 666 counts. The District Court denied that motion, too.

The defendants now appeal the District Court's denial of the two acquittal motions. We have appellate jurisdiction under our authority to review "pretrial orders rejecting claims" under

the Double Jeopardy Clause.  <u>Abney</u> v. <u>United States</u>, 431 U.S. 651, 662 (1977).  We review the "constitutional questions" raised de novo.  <u>United States</u> v. <u>Lanoue</u>, 137 F.3d 656, 661 (1st Cir. 1998) (citing <u>United States</u> v. <u>Aguilar-Aranceta</u>, 957 F.2d 18, 21 (1st Cir. 1992), <u>abrogated on other grounds</u>, <u>Yeager</u> v. <u>United States</u>, 557 U.S. 110, 119 (2009)).

## II.

We start by addressing the defendants' arguments about the preclusive effect of the § 666-based Travel Act and conspiracy acquittals.[3]  The defendants' arguments rely on "the rule of collateral estoppel" that "is embodied in the Fifth Amendment guarantee against double jeopardy."  <u>Ashe</u> v. <u>Swenson</u>, 397 U.S. 436, 444-45 (1970).  Before considering whether that rule applies in this case, however, we need to say more about how the rule applies generally.

This aspect of the Double Jeopardy Clause ensures that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between

---

[3]  The government does not argue that the defendants waived this challenge by failing to raise it in <u>Fernandez</u>.  <u>See</u> <u>United States</u> v. <u>Medina-Villegas</u>, 700 F.3d 580, 585 (1st Cir. 2012) ("The law of the case doctrine 'bars a party from resurrecting issues that either were, or could have been, decided on an earlier appeal.'" (quoting <u>United States</u> v. <u>Matthews</u>, 643 F.3d 9, 12-13 (1st Cir. 2011))).  We thus address the challenge, as the defendants' failure to raise it in <u>Fernandez</u> does not affect our jurisdiction to consider it.  <u>See</u> <u>Cohen</u> v. <u>Brown Univ.</u>, 101 F.3d 155, 168 (1st Cir. 1996).

the same parties in any future lawsuit." Id. at 443. In Ashe, the Supreme Court made clear that the rule "is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book." 397 U.S. at 444. The inquiry, instead, "'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" Ashe, 397 U.S. at 444 (quoting Sealfon v. United States, 332 U.S. 575, 579 (1948)).

To that end, Ashe instructs that we must "'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" Id. (quoting Daniel K. Mayers & Fletcher L. Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv. L. Rev. 1, 38—39 (1960)). And, if a review of all that material shows that a "rational jury," as a practical matter, decided adversely to the government an issue to be relitigated in the new prosecution, then the defendant gets the benefit of collateral estoppel. See id. In other words, under the rule, the government may not "relitigat[e] any issue that was necessarily decided by a jury's acquittal in a prior trial," even

in a trial for a different offense.[4]  Yeager 557 U.S. at 119 (discussing Ashe, 397 U.S. at 445-46).

Ashe supplies a good example of what it means to "set in a practical frame" the inquiry into what the jury necessarily decided.  Id. at 444 (quoting Sealfon, 332 U.S. at 579).  There, the jury had acquitted a defendant of the robbery of one victim in the basement of a home in a case that involved the robbery of multiple victims in that home at that same time.  Id. at 437-38. The new prosecution of that defendant focused on a different one of the victims.  Id. at 439-40.  In that respect, the new prosecution involved a distinct offense.  But the Court still concluded that the prior acquittal barred the government from going forward with the new prosecution.  Id. at 446.

To reach that conclusion, Ashe undertook a careful review of the record in the first trial.  See id. at 438-39.  The review

_____

[4]  Bravo contends that Ashe's instruction for us to "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter," 397 U.S. at 444, applies only to acquittals based on a general verdict.  And Bravo points out that the defendants' trial involved a special verdict form.  But while we agree with Bravo that the "special verdicts themselves must be considered" in undertaking the Ashe inquiry, in this case, as we will explain, the special verdict form alone does not provide enough information to resolve the defendants' arguments.  We therefore, for reasons provided below, must consider the materials that Ashe identifies along with the special verdict form to determine whether the acquittals the jury recorded in the special verdict form necessarily decided an issue adversely to the government that the government would have to relitigate in the renewed prosecutions on the standalone § 666 counts.

considered the evidence introduced, the arguments of counsel, and the jury instructions. See id. The Court concluded from that review that, in acquitting, the jury had necessarily decided that the defendant was not present at the home where the victims had been robbed. Id. at 445. The Court then concluded that the jury's resolution of that issue adversely to the government was as determinative of the government's ability to prove its case in the second prosecution as in the first. See id. at 445-46. And so the Court held that the second prosecution could not go forward even though the named victim was different. Id.

There is, however, an important limitation on the application of the rule of collateral estoppel that, Ashe held, the Double Jeopardy Clause incorporates. And this limitation is of potential relevance to the collateral estoppel effect that we should accord to the acquittals on which the defendants rely here, in light of the convictions on the standalone § 666 counts that this same jury also rendered.

This limitation is set forth in the Supreme Court's decision in United States v. Powell, 469 U.S. 57 (1984). There, the Supreme Court explained that where "the same jury reached inconsistent results . . . [,] principles of collateral estoppel -- which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict -- are no longer useful." Id. at 68. Relying on its prior holding to the

same effect in <u>Dunn</u> v. <u>United States</u>, 284 U.S. 390 (1932), <u>Powell</u> gave the following reason for this rule: "[W]here truly inconsistent verdicts have been reached, '[t]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" <u>Powell</u>, 469 U.S. at 64-65 (quoting <u>Dunn</u>, 284 U.S. at 393).

<u>Powell</u> acknowledged that it is, of course, possible that an acquittal that is inconsistent with a conviction still reflects a jury's finding of reasonable doubt as to guilt. <u>Id.</u> But <u>Powell</u> explained that "[i]t is equally possible that the jury, convinced of guilt, properly reached its conclusion on the [convicted] offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the [acquitted] offense." <u>Id.</u> at 65.

<u>Powell</u> for that reason rejected the argument that, under <u>Ashe</u>, an acquittal could, via collateral estoppel, invalidate a truly inconsistent conviction that was rendered by the same jury in the same proceeding. <u>Id.</u> at 64. In such a case, <u>Powell</u> concluded, there is no way to know without speculating which of the inconsistent verdicts -- the acquittal or the conviction -- "the jury 'really meant.'" <u>Id.</u> at 68. The government, of course, cannot challenge the acquittals on that basis -- the acquittals

-13-

must stand.  See id.  But the inconsistency makes the jury's findings indecipherable.  See id. at 65-68.  And so "principles of collateral estoppel" -- which require a determination of what the jury necessarily decided -- are impossible to apply.  Id. at 68.

Thus, in light of Powell, the defendants do not deny that a true inconsistency in what the jury has done in acquitting on one offense while convicting on another can make unanswerable Ashe's question about what the jury necessarily decided in rendering the acquittal.  And so long as that question cannot be answered, the acquittal cannot be given collateral estoppel effect such that it would bar a prosecution for a related offense.

Against this legal background, the defendants admit they need to show two things in order for their collateral estoppel argument to succeed and bar the renewed prosecutions on the standalone § 666 counts.  The defendants need to show that the acquittals on the Travel Act and conspiracy counts involving § 666 would, considered on their own, collaterally estop the renewed, standalone § 666 prosecutions.  The defendants further need to show that, under Powell, the now-vacated convictions on those standalone § 666 counts do not strip the § 666-based Travel Act and conspiracy acquittals of the collateral estoppel effect that they otherwise might have.  Although the defendants need to make both showings in order to prevail, the arguments the defendants make with respect to each showing are not unrelated to one another.  In particular,

-14-

understanding the defendants' arguments about what the acquittals show on their own helps to set the stage for many of the defendants' arguments about why those acquittals have collateral estoppel effect notwithstanding the convictions that the jury also rendered. We therefore consider each part of the defendants' collateral estoppel argument in turn.

### III.

We begin by setting to one side the convictions on the standalone § 666 counts and examining whether the acquittals on the conspiracy and Travel Act counts involving § 666 would, considered on their own, support the defendants' collateral estoppel argument. To make that argument, the defendants seek to demonstrate that the jury, in acquitting on the conspiracy and Travel Act counts involving § 666, necessarily decided that the government had failed to prove that the defendants violated § 666. And the defendants further contend that the jury's finding as to the failure of proof concerned, in particular, the exchange theory of § 666 liability on which the renewed prosecutions must depend. See Fernandez, 722 F.3d at 19-20, 28.

We start with the defendants' contention that the acquittals show that the jury found a failure of proof as to § 666. One obstacle the defendants face in making that showing arises from the nature of the two offenses on which the jury acquitted. As to each, § 666 was implicated only as a predicate offense. And so

-15-

there is a question whether the jury's acquittals concerned the predicate offense at all.

In the abstract, as the government points out, an acquittal for conspiracy does not necessarily show that the jury found that the government failed to prove that the defendant committed the predicate offense.  See, e.g., United States v. Marino, 277 F.3d 11, 39 (1st Cir. 2002).  Conspiracy requires proof of elements independent of the predicate offense, including the element that there be an agreement between "two or more persons."  See 18 U.S.C. § 371.  It is thus possible that a jury's acquittal on conspiracy reflects only that jury's finding that the government failed to prove one of those independent elements -- such as the element of agreement -- rather than that the government failed to prove a violation of the predicate offense.

Similarly, the Travel Act requires proof of elements, including interstate travel, that are independent of the predicate offense.  See 18 U.S.C. § 1952.  And thus, in theory, as the government also notes, an acquittal on that offense might rest only on a jury's finding that the government failed to prove one of the independent elements and not on a finding that the government had failed to prove the predicate offense itself.  See, e.g., United States v. Stafford, 831 F.2d 1479, 1482 (9th Cir. 1987).

But the defendants argue -- and the government does not contend otherwise -- that the independent elements of the

conspiracy and Travel Act offenses are not material to the collateral estoppel analysis here. In support of that argument, the defendants point to the nature of the charged conduct for the predicate § 666 offense for the conspiracy and Travel Act counts.

That conduct included a trip the defendants took from Puerto Rico to Nevada to see a boxing match, in connection with support for pending legislation. The defendants thus argue that the charged conduct involved both travel and agreement. On that basis, the defendants contend -- and, again, the government does not argue to the contrary -- that the independent elements of travel and agreement for the conspiracy and Travel Act counts involving § 666 necessarily overlapped with elements of § 666 itself. Thus, the defendants argue, when the jury acquitted on those counts, the jury necessarily rejected liability under § 666 itself, even though § 666 was only a predicate offense for the conspiracy and Travel Act counts.

We next consider the defendants' contention that the acquittals show that the jury rejected the exchange theory of § 666 liability in particular. Here, too, the defendants contend that there is no problem. The defendants point out that the acquittals show that the jury rejected every theory of § 666 liability that the jury was given, including the exchange theory. In this way, the defendants contend that the "record of the prior proceeding," Ashe, 397 U.S. at 444 (quoting Mayers & Yarbrough, supra), shows

-17-

that the acquittals on the conspiracy and Travel Act counts for which § 666 was the predicate offense do have collateral estoppel effect on the renewed, standalone § 666 prosecutions.

But even if we were to accept each step in the defendants' argument to this point, the defendants still would need to show one more thing.[5] The defendants would still need to show that the conspiracy and Travel Act acquittals do not lose the collateral estoppel effect that they otherwise might have in consequence of the convictions that the jury also rendered on the standalone § 666 counts. Accordingly, we now take up that issue.

**IV.**

The defendants offer two reasons for concluding that the vacated convictions on the standalone § 666 convictions do not, under Powell's limitation on the rule of collateral estoppel, strip the acquittals on the conspiracy and Travel Act counts involving § 666 of collateral estoppel effect. Neither reason the defendants offer, however, is persuasive.

---

[5] The government does not argue that the acquittals the defendants rely on rested on a rejection of the extra elements involved in those offenses. But neither does the government expressly concede that the acquittals did reject § 666 liability. Instead, the government argues that the acquittals are "at most inconsistent" with the convictions on the issue of § 666 liability. As we find such an inconsistency, we need not decide whether the acquittals did reject § 666 liability, or whether they instead rested only on a rejection of some extra element.

-18-

**A.**

The defendants' first reason is that the convictions on the standalone § 666 counts have been vacated and are no longer final. See Fernandez, 722 F.3d at 27. The defendants thus argue that the acquittals alone should be considered in determining what the jury necessarily decided under Ashe. And, the defendants further contend, because the acquittals, considered on their own, show that the jury did reject § 666 liability, the Double Jeopardy Clause bars the renewed prosecutions on the standalone § 666 counts.

We do not agree, however, that we may not consider the vacated convictions as part of our collateral estoppel inquiry, under Ashe, into what the jury necessarily decided. Our reasoning on this point follows in large part from Ashe itself.

There, the Court instructed that, for purposes of determining the collateral estoppel effect of acquittals, we must undertake a "practical" analysis based on the "record" of the prior proceeding, and with "'an eye to all the circumstances of the proceedings.'" Ashe, 397 U.S. at 444 (quoting Sealfon, 332 U.S. at 579). Like the acquittals on which the defendants rely, the convictions in this case are part of what the jury decided at trial. For that reason, Ashe's expansive instruction to consider what happened in the prior proceeding points strongly in favor of

taking account of not only the acquittals but also the convictions, even though they have been vacated.

The fact that a vacated conviction has been "nullified," <u>Bullington</u> v. <u>Missouri</u>, 451 U.S. 430, 442 (1981), moreover, does not require a different conclusion. "When a court vacates a conviction, it sets aside or nullifies the conviction and its attendant legal disabilities; the court does not necessarily attempt to erase the fact of the conviction." <u>United States</u> v. <u>Crowell</u>, 374 F.3d 790, 792 (9th Cir. 2004). And it is the "fact of the conviction," and not its "attendant legal disabilities," <u>id.</u>, that is relevant to the <u>Ashe</u> analysis of what the jury's verdicts show that the jury necessarily decided.

In addition, the convictions at issue here were vacated only for trial error. See <u>Fernandez</u>, 722 F.3d at 26-27. But a "reversal for trial error . . . does not constitute a decision to the effect that the government has failed to prove its case." <u>Burks</u> v. <u>United States</u>, 437 U.S. 1, 15 (1978). Thus, for purposes of deciding whether the jury necessarily decided that the government failed to prove that the defendants violated § 666, the fact the jury also convicted the defendants of violating § 666 would seem to be of quite obvious relevance, even though the convictions were later vacated.

We also do not agree with the defendants that, in conducting the <u>Ashe</u> analysis, we should disregard vacated

convictions because they are not meaningfully different from hung counts, which are counts on which the jury reached no verdict at all. The defendants rely for their contention on the Supreme Court's decision in Yeager v. United States, 557 U.S. 110.

In Yeager, the Court held that hung counts are, for purposes of performing Ashe's collateral estoppel inquiry into what a jury necessarily decided, "not a 'relevant' part of the 'record of [the] prior proceeding.'" Id. at 121 (quoting Ashe, 397 U.S. at 444). In reaching that conclusion, Yeager explained that Powell relied on the need to respect the finality of an otherwise valid verdict in refusing to overturn a conviction that seemingly conflicted with an acquittal. Yeager, 557 U.S. at 124. Yeager reasoned in this regard that the same concern about respecting final verdicts applied equally to respecting the finality of an acquittal. See id. Yeager thus declined to allow a hung count -- which was not a final verdict -- to create a conflict with an acquittal -- which was. Id.

But we do not believe Yeager supports treating vacated convictions like hung counts under Ashe. For while a vacated conviction, like a hung count, is not a final jury verdict, Yeager did not rely solely on a respect-for-finality rationale to explain why hung counts should not be considered for Ashe purposes. Nor did Yeager hold that a verdict that lacked finality could never bear on an acquittal's collateral estoppel effect. Instead, in

-21-

refusing to conclude that a hung count could create a "truly inconsistent" verdict, Yeager also explained that "a jury speaks only through its verdict," and that there was "no way to decipher what a hung count represents" as a hung count represents not "a jury's decision[]" but only "its failure[] to decide." Id. at 121-122.

This line of reasoning in Yeager suggests that, under Ashe, vacated counts should be treated differently from hung counts. After all, vacated convictions, unlike hung counts, are jury decisions, through which the jury has spoken. In other words, vacated convictions are still part of what the jury did decide at trial. For that reason, vacated convictions on some counts do potentially bear on the question whether the jury, in acquitting on other counts, necessarily decided an issue in a manner contrary to what the government would have to prove in renewed prosecutions. See Yeager, 557 U.S. at 115. And that is because Powell's "prudent acknowledgment" that inconsistent verdicts make it impossible to determine what a jury necessarily decided, 469 U.S. at 65, 68, is not undermined by the mere fact that a potentially conflicting conviction has been vacated. Rather, a vacated conviction may still suggest that an acquittal with which that conviction conflicts was the result of "mistake, compromise, or lenity." Id. at 65. And so unless the inconsistency can be resolved,

"principles of collateral estoppel . . . are no longer useful."
Id. at 68.

We thus conclude that vacated convictions, unlike hung counts, are relevant to the Ashe inquiry into what a jury necessarily decided when acquitting on counts related to the vacated convictions.[6]  In doing so, we join the only other circuits to have decided the issue, see United States v. Citron,  853 F.2d 1055, 1059 (2d Cir. 1988); United States v. Price, 750 F.2d 363, 366 (5th Cir. 1985),[7] as well as the highest courts of New Jersey and the District of Columbia, see State v. Kelly, 992 A.2d 776, 789 (N.J. 2010); Evans v. United States, 987 A.2d 1138, 1141-42 (D.C. 2010).  And although a divided Michigan Supreme Court recently came

---

[6]    To be clear, although we conclude that the vacated convictions might prevent the acquittals from collaterally estopping the renewed prosecutions, the acquittals themselves remain inviolate.  They forever bar the United States from prosecuting the defendants for conspiracy and Travel Act offenses based on the charged conduct and § 666 as a predicate offense.  Likewise, our taking account of the vacated convictions does not undermine the defendants' victory in getting those convictions set aside.  The defendants still get the benefit of their appellate victory in Fernandez, as the convictions have been vacated, and the government in a second prosecution cannot present the impermissible gratuity theory.

[7]   Although Citron and Price predate Yeager, both the Second and Fifth Circuits decided that vacated counts are relevant to the Ashe analysis at a time when those circuits had already ruled that hung counts should be disregarded for purposes of the Ashe inquiry. See United States v. Mespoulede, 597 F.2d 329, 332, 335-36 (2d Cir. 1979); United States v. Nelson, 599 F.2d 714, 716-17 (5th Cir. 1979).  And the Second Circuit has continued to follow Citron after Yeager.  See United States v. Bruno, 531 F. App'x 47, 49 (2d Cir. 2013) (unpublished).

to the opposite judgment, we find the dissenting opinion in that case more persuasive on this point. See People v. Wilson, 852 N.W.2d 134 (2014); see also id. at 142 (Markman, J., dissenting).[8]

Thus, in undertaking our Ashe inquiry into the collateral estoppel effect that must be given to the acquittals on the conspiracy and Travel Act counts involving § 666, we must consider the now vacated, standalone § 666 convictions. Contrary to the defendants' contention, the fact that those convictions were overturned for trial error provides no basis for excluding them from the record that Ashe requires us to consider.

**B.**

The defendants do have a fallback position. They argue that, even if the convictions must be considered as part of the Ashe inquiry, the convictions do not deprive the acquittals of collateral estoppel effect. That is because, the defendants

---

[8] Martínez does cite an unreported decision of the Appellate Division of the Superior Court of New Jersey in which that court referred to its "inclination to regard the counts on which [it] had reversed the defendant's conviction . . . as a nullity, analogous to a situation where there is a hung jury on certain counts." State v. Hermalyn, No. 06-11-2085, 2012 WL 3000334, at *1 (N.J. Super. Ct. App. Div. July 24, 2012) (per curium) (citing Yeager, 557 U.S. at 120). Hermalyn provides no explanation for that "inclination," and it appears directly inconsistent with the New Jersey Supreme Court's opinion in Kelly, which Hermalyn did not cite. See Kelly, 992 A.2d at 789. In Kelly, which like this case (and like Hermalyn) involved the retrial of vacated convictions, the New Jersey Supreme Court held that "Yeager has no application to a case . . . involving an inconsistent verdict of acquittals and convictions returned by the same jury," as opposed to hung counts. Id. at 778, 789.

-24-

contend, the trial record shows that the convictions on the standalone § 666 counts are actually consistent with the acquittals on those counts for which § 666 was a predicate offense. And, further, the defendants contend that the verdicts on those counts -- though involving both convictions and acquittals -- are consistent in a way that shows that the acquittals did reject the exchange theory of § 666 liability and thus should be given collateral estoppel effect to bar the renewed standalone § 666 prosecutions. Thus, the defendants argue, the convictions do not create "truly inconsistent" verdicts with respect to § 666 that would implicate Powell's limitation on the collateral estoppel rule. 469 U.S. at 64.

To show how the convictions and acquittals may be reconciled in this way, Martínez explains that "[a] 'rational' jury could conclude a defendant had not committed bribery [under an exchange theory] . . . while at the same time convicting the same defendant under a gratuity theory under Section 666." And so, Martínez argues, "concluding that the jury found a gratuity and not bribery [in convicting on the standalone § 666 counts] is the logical way to reconcile the verdict." Or, as Bravo puts the point in his brief, the "only logical conclusion is that the jury rested its §[ ]666 convictions on a finding of gratuities, not §[ ]666 bribery [under the proper exchange theory], and that its verdicts

on the conspiracy and Travel Act counts necessarily rejected a §[ ]666 bribery theory [under the proper exchange theory]."

In making this argument, the defendants rely solely on a claim about how the jury was instructed.[9]  In particular, the defendants contend that the District Court presented the improper gratuity theory to the jury only as to the standalone § 666 counts. The defendants thus contend that -- consistent with the jury instructions -- the jury could have convicted on the standalone § 666 counts on the gratuity theory without having to consider (and

---

[9]  The defendants offer no other argument for how the jury rationally could have acquitted on the conspiracy and Travel Act counts that involved § 666 in a way that rejected only the exchange theory of § 666 liability and not the gratuity theory as well. Perhaps the defendants could have argued that a gratuity, unlike a quid pro quo exchange, involves no agreement.  If a gratuity need not involve an agreement, then it could be argued that the § 666-based conspiracy acquittals rejected only the exchange theory of § 666 liability.  A gratuity theory of § 666 liability, by not requiring that there be an agreement, would arguably not have required the jury to find conspiracy liability.  But the defendants do not make such an argument for reconciling the verdicts, and so we do not address whether there is any force to the argument.

The reason the defendants do not make that additional argument, moreover, is readily apparent.  The argument does not help with respect to the separate, § 666-based Travel Act acquittals.  In this case, the allegedly unlawful payment took the form of an all-expenses paid interstate trip.  Whether that trip was given as a gratuity or as a quid pro quo exchange, it would still involve interstate travel.  And thus, if the jury concluded the trip violated § 666 then the jury should also have found a § 666-based Travel Act violation.  See 18 U.S.C. § 1952(a)(3) (prohibiting interstate travel to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity").  Yet the jury did not do so.  Thus, if the defendants' differential jury instructions argument does not hold up, then they are left with verdicts on § 666 that are unavoidably inconsistent with each other.

-26-

thus reject) that same theory in acquitting on the conspiracy and Travel Act counts that involved § 666.  In this way, the defendants argue, the verdicts concerning § 666 -- whether as a standalone or predicate offense -- may be harmonized.  The acquittals rejected one theory of § 666 liability (the proper one) and the convictions accepted another theory of § 666 liability (the improper one).

The Supreme Court in Powell -- in holding that an acquittal lacks collateral estoppel effect when truly inconsistent with an accompanying conviction -- did not directly confront an argument like this one.  The defendant in Powell was arguing that the verdicts were inconsistent in order to compel the reversal of a conviction in consequence of a supposedly contradictory acquittal.  469 U.S. at 60.  And the government, in defending the conviction against such challenge, did "not dispute the inconsistency." Id. at 69.  The Supreme Court thus did not need to address in Powell how courts should determine whether verdicts are inconsistent when a defendant seeking to benefit from the collateral estoppel effect of an acquittal denies that the acquittal really is in conflict with a conviction that the jury also rendered. See id.  Nor has the Supreme Court had occasion to address that issue in any subsequent case.

Because Ashe governs the defendants' underlying collateral estoppel argument, however, we believe that Ashe's instruction to consider the record in the prior proceeding in

determining what the jury necessarily decided is fully applicable to this aspect of the collateral estoppel inquiry. Moreover, we agree with the defendants that jury instructions are relevant to the review of the record that Ashe requires. See 397 U.S. at 444 (explaining that the inquiry should consider the "charge" to the jury); United States v. Brown, 983 F.2d 201, 202 (11th Cir. 1993) (listing "jury instructions" as among the "relevant matters" to be considered in the Ashe inquiry); see also United States v. Olano, 507 U.S. 725, 740 (1993) (describing "the almost invariable assumption of the law that jurors follow their instructions" (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987))). Relevant as well to the Ashe inquiry are the parties' "closing arguments." Brown, 983 F.2d at 202.

And so, to evaluate the defendants' fallback argument, we review the trial record -- and, in particular, the jury instructions and the arguments that the parties made to the jury about the meaning of § 666 -- to determine whether the verdicts involving § 666 may be reconciled in the way the defendants propose. If it turns out from that review that the verdicts may be reconciled by reference to the jury instructions and the arguments of counsel, then the "assumption that the jury acted rationally and found certain facts in reaching its verdict" will be restored, and collateral estoppel principles will again be useful. See Powell,

469 U.S. at 68; Wilson, 852 N.W.2d at 151-52 n.12 (Markman, J., dissenting).

In taking up this inquiry, we are mindful that the defendants bear the burden of showing that the jury necessarily decided an issue adversely to the government that the government needs to prove in order to convict on a related offense in a new trial. See Schiro v. Farley, 510 U.S. 222, 232 (1994). But we are also mindful that, if "any reasonable assessment of the verdict" would lead to a reconciliation of the apparent inconsistency between the convictions and the acquittals involving § 666, we might be required to adopt that account. Fernandez, 722 F.3d at 34. As we put it in Fernandez, "[w]e will not bend over backwards to formulate some route" to allow the government to re-prosecute. Id.

As we will explain, however, the record in this case shows that the jury was offered the same theories of § 666 liability as to every count involving § 666, whether as a predicate offense or a standalone crime. We therefore conclude that on this record no reasonable assessment of the verdicts is available that reconciles the verdicts in the way the defendants propose. And in consequence of the inconsistency in those verdicts, we conclude that, consistent with the Supreme Court's decision in Powell, the defendants cannot meet their burden of showing that the acquittals

involving § 666 collaterally estop the renewed, standalone § 666 prosecutions.

## 1.

Consider the first pair of instructions that the jury received regarding § 666. These were the ones that we held were erroneous in <u>Fernandez</u>. 722 F.3d at 26-27. The District Court began each erroneous instruction by explaining that "to find [each defendant] guilty of <u>bribery</u>, you must be convinced that the Government has proven each of the following things beyond a reasonable doubt . . . ." (emphasis added). The instructions then went on to define "bribery" in a way that included both the proper exchange theory and the improper gratuity theory. <u>See</u> <u>id.</u>

Significantly, nothing in these instructions tied or restricted that definition of "bribery" -- improper though it was -- to the standalone § 666 counts in particular. And thus nothing about these instructions suggests that the jury was offered the gratuity theory only as to the standalone counts on which the jury convicted, and not as to the other counts involving § 666, for which § 666 was a predicate offense and on which the jury acquitted.

The written version of these instructions, moreover, was given to the jury under the heading "Bribery Concerning Programs Receiving Federal Funds, 18 U.S.C. § 666(a)(2)." That heading also tied the definition of bribery to § 666 as an offense without tying

-30-

that definition to the standalone § 666 counts specifically. And thus, on its face, the heading did not exclude the improper gratuity theory from applying to the other counts involving § 666 as a predicate crime -- namely, the counts that resulted in the acquittals.

An examination of the jury instructions with respect to the Travel Act counts reinforces the point. The District Court instructed the jury that the government had to prove "[f]irst, that the Defendants travelled [sic] in interstate commerce; [and] [s]econd, that they did so with the intent to promote, manage, establish, carry on, or facilitate . . . an 'unlawful activity,' here, a violation of Federal or Puerto Rico law regarding criminal bribery." The District Court then explained that "[t]he elements of bribery in violation of the bribery laws of the United States -- specifically, Title 18, United States Code, Section 666(a)(1)(B) and 666(a)(2) -- are discussed elsewhere in these instructions." In other words, the instructions on the Travel Act counts explicitly incorporated by reference the later, erroneous instructions on what was needed to convict the defendants of "bribery" under § 666. Thus, contrary to the defendants' contention, the jury had no basis for applying a different "bribery" definition in the Travel Act counts for which § 666 was a predicate offense -- and on which the jury acquitted -- from the

"bribery" definition that the jury applied in the standalone § 666 counts -- on which the jury convicted.

The jury instructions on the conspiracy counts are no different in this regard. The jury was told:

> For you to find Defendants Bravo and Martinez guilty of conspiracy, you must be convinced that the Government has proven each of the following beyond a reasonable doubt: First, that the agreement specified in the Indictment, and not some other agreement or agreements, existed between at least two people to: Commit bribery concerning federal funds, pursuant to Title 18, United States Code, Section 666, or; Travel in interstate commerce in aid of racketeering, pursuant to Title 18, United States Code, Section 1952 . . . .

The District Court then provided instructions on the requirements for finding an agreement, but said nothing at all at that time about what "bribery concerning federal funds, pursuant to Title 18, United States Code, Section 666" meant. And so with respect to the conspiracy counts involving § 666, the jury was not given any cause to apply a different definition of "bribery" in the conspiracy counts from that which the jury had been instructed to apply to the standalone § 666 counts.

Nor did the parties' closing arguments suggest that different theories of § 666 liability applied. In its closing argument, the government did use, in connection with the standalone § 666 counts, the "intent to influence or reward" language that we held in <u>Fernandez</u> had allowed the jury to consider the

-32-

impermissible "gratuity" theory.  See 722 F.3d at 18.  But the government, like the jury instructions, used that language in defining what "bribery that involves federal funds" meant.  The government thus said nothing to suggest that the gratuity theory was inapplicable to the Travel Act and conspiracy counts involving § 666.

In fact, when the government turned in its closing argument to the Travel Act counts, the government said only as to the meaning of bribery that the defendants must have traveled "with the intent to commit a crime.  And here, the crime's bribery."  Further, when the government turned to the conspiracy counts, the government argued expressly that "the agreement has to be to commit one of the two crimes we've already talked about:  Federal program bribery or interstate travel in aid of racketeering" (emphasis added).  The government's closing argument, therefore, did not suggest that the definition of bribery discussed with respect to the standalone § 666 counts applied exclusively to those counts.

Finally, Martínez's counsel in his closing argument underscored the equivalence between "bribery" as used in the standalone § 666 counts and as used in the conspiracy and Travel Act counts involving § 666.  Martínez's counsel argued that the jury should apply only the exchange theory of bribery.  But he made that argument with respect to "Counts 1, 2, 3, and 4, and 5" -- in other words, with respect to all of the counts (conspiracy, Travel

-33-

Act, and standalone) involving § 666. Nothing Martínez's counsel said, therefore, suggested any difference between the definition of "bribery" the jury was to use as to any of these counts, even though the jury convicted on some and acquitted on others.[10]

We therefore conclude that the District Court instructed the jury to consider the gratuity theory of § 666 liability not only on the standalone § 666 counts, but also on the Travel Act and conspiracy counts for which § 666 was a predicate offense. And further, we conclude that the closing arguments by counsel accord with this same understanding of how the jury was to be instructed.

**2.**

The defendants do seize on one bit of language from Fernandez in support of their contention that the jury received different instructions as to some of the counts involving § 666. In Fernandez, we did observe that the jury received a correct bribery instruction, which allowed only the exchange theory, alongside the improper one that allowed both the exchange and the gratuity theories. Id. at 20. In doing so, we explained that this proper instruction "applied to both the Puerto Rico and federal bribery counts," whereas the erroneous instructions setting forth the gratuity theory were "instructions on the § 666 counts themselves." Id.

---

[10] Bravo's counsel also gave a closing argument, but his argument did not address the definition of bribery.

-34-

The defendants argue that this quoted language -- by referring to the "§ 666 counts" -- shows that we held in Fernandez that the jury received the improper gratuity instruction only for the standalone § 666 counts, and not for those counts involving § 666 that resulted in acquittals, each of which involved § 666 only as a predicate offense. In this way, the defendants contend that Fernandez supports their argument that the jury's apparently inconsistent verdicts can be reconciled by reference to the instructions the jury received.

But the defendants overread the quoted language. Fernandez did not decide whether "the § 666 counts" to which we said the erroneous instructions applied included only the standalone § 666 counts. See id. In context, it seems clear that by "the § 666 counts" we meant to distinguish those counts that involved § 666 from those counts that involved Puerto Rico bribery law. See id. We were not drawing a distinction among the "§ 666 counts," counts that in fact included the Travel Act and conspiracy counts for which § 666 was a predicate offense.

Indeed, we had no occasion in Fernandez to consider whether the erroneous instructions on the meaning of § 666 also applied to the Travel Act and conspiracy counts for which § 666 was a predicate offense. The acquittals on those counts were, obviously, not under review in that appeal. See id. at 8.

Moreover, it is not surprising that the erroneous instructions offering up the gratuity theory applied to all the counts involving § 666, and not just to the standalone § 666 counts. As we explained in Fernandez, courts have divided with respect to whether § 666 does or does not criminalize gratuities. See id. at 23-27. And while we held in Fernandez that § 666 does not criminalize gratuities, id. at 27, the District Court, in giving the erroneous instructions over the defendants' objections, evidently had determined that § 666 did criminalize gratuities. No party argued to the District Court, however, that § 666 criminalizes gratuities when the defendant is prosecuted for § 666 violations themselves, but not when § 666 serves as a predicate offense for conspiracy or Travel Act violations. Nor do the defendants advance any such argument on appeal.

For that reason, it makes perfect sense that the District Court's instructions on what § 666 prohibited were given as to all counts involving that offense, both when § 666 served as a predicate offense and when it stood alone. And, as we have just explained, the record shows that the instructions setting forth the erroneous gratuity theory of § 666 liability applied broadly to all counts involving § 666. As discussed, explicit and implicit cross-references in the jury instructions show that the erroneous instructions on § 666 were given as to all the counts that involved

§ 666 as a predicate offense, including the counts involving § 666 on which the jury rendered acquittals.

**3.**

This fact about the counts to which the jury instructions -- and the arguments of counsel -- applied is incompatible with the defendants' account of what the jury did. If, as the defendants contend, the jury based the now-vacated, standalone § 666 convictions solely on a gratuity theory, then the jury should have considered that same gratuity theory and found the defendants guilty when the jury issued its verdicts on at least the Travel Act charges for which § 666 was a predicate offense.[11] After all, the instruction allowing the gratuity theory applied, by its terms, to all § 666-related counts. And yet the jury found the defendants not guilty on those § 666-based Travel Act charges. The verdicts are thus inconsistent with respect to § 666 liability, even

---

[11] In referring to the § 666-based Travel Act charges, we do not include the conspiracy to violate the Travel Act charges. We set those conspiracy charges, as well as the charges for conspiracy to violate § 666, to one side even though, as noted above, supra note 9, the defendants make no argument distinguishing the conspiracy charges from the Travel Act charges in attempting to reconcile the verdicts. We limit our focus in this way because, even if the § 666-based conspiracy acquittals could be squared with the standalone § 666 convictions on the ground that a gratuity-theory § 666 violation need not have involved an agreement, see id., the § 666-based Travel Act acquittals not involving conspiracy are not subject to any such squaring. The result is that the § 666-based Travel Act acquittals suffice on their own to create truly inconsistent verdicts concerning § 666 liability, and thus to prevent the defendants from meeting their burden under Ashe to show what the jury necessarily decided.

assuming, as the defendants contend, that the convictions on the standalone § 666 counts relied only on the jury's acceptance of the gratuity theory.

If, on the other hand, the jury interpreted the instructions' conflicting definitions of "bribery" to allow for only an exchange theory of § 666 liability, then the verdicts would still be irreconcilable. And that is again because the same instructions on the meaning of bribery in § 666 were given as to all counts involving § 666. The convictions on the standalone counts would thus show that the jury found the defendants guilty under the proper, exchange theory of § 666. In contrast, the acquittals on the Travel Act counts based on the § 666 predicate offense would show that the jury found the defendants not guilty under that same exchange theory of § 666. Once again, the acquittals would be inconsistent with the convictions with respect to the defendants' liability under § 666.

For that reason, the argument that we must read the verdicts consistently if possible does not, on this record, help the defendants meet their burden under Ashe. And that is because no consistent reading of the verdicts is available -- given this record -- that would support, under Ashe's practical inquiry, the defendants' favored conclusion: namely, that the jury acquitted the defendants on the exchange theory of § 666 and convicted the defendants only on the gratuity theory.

Of course, it is possible that the jury did actually find the defendants guilty on the standalone § 666 counts only on the basis of a gratuity theory and not on the basis of an exchange theory. And it is also possible that the jury considered (and rejected) only the exchange theory in acquitting on the Travel Act counts involving § 666. But it was equally possible in Powell that the jury "really meant" to acquit rather than to convict, when the jury did both, and yet that mere possibility did not lead the Court to give the acquittal collateral estoppel effect. Powell, 469 U.S. at 68.

So, too, here. Nothing about the instructions or the record in the prior proceeding suggests that the jury did what the defendants necessarily contend that the jury did -- depart from the District Court's instructions and rely on different theories of § 666 liability in assessing the different counts involving that offense. We could therefore come to such a conclusion only by engaging in the sort of "pure speculation" or "inquiries into the jury's deliberations" that Powell forbids. Id. at 66. And such a speculative exercise could hardly suffice to satisfy the defendants' burden under Ashe of showing that "the issue whose relitigation [they] seek[] to foreclose was actually decided" in the prior proceeding. Schiro, 510 U.S. at 233.

## c.

The defendants do make one final argument on behalf of their attempted reconciliation of the acquittals and the convictions that involve § 666. The defendants point to this Court's handling of a separate collateral estoppel issue in Fernandez. See 722 F.3d at 29-33. The defendants argue that this aspect of our decision in Fernandez supports the conclusion that the jury's acquittals of the defendants on the counts for which § 666 is a predicate offense were consistent with the jury having convicted the defendants on the standalone § 666 counts. See id.

But our analysis in Fernandez does not compel a finding of collateral estoppel here. In fact, if anything, our analysis of the collateral estoppel issue in Fernandez shows why, in light of this record, a finding of collateral estoppel here would be unwarranted given Powell's rule against speculating about what a jury did in the case of truly inconsistent verdicts.

The collateral estoppel issue arose in Fernandez in the following way. The jury had convicted Bravo of conspiring to violate the Travel Act in furtherance of unspecified "racketeering" activity. 722 F.3d at 34. We had vacated that conviction. Id. We did so because of the possibility that the "racketeering" activity the jury found had concerned violations of the Puerto Rico bribery law -- a law that had been repealed before the relevant

actions the defendants had undertaken -- rather than violations of § 666.  Id.

Bravo then sought to foreclose his future prosecution for conspiracy to violate the Travel Act in furtherance of § 666 violations specifically.  See id. at 33.  We interpreted Bravo's argument against such a future prosecution as being based on the collateral estoppel rule contained in Ashe.  Id. at 33 & n.25. Specifically, Bravo contended that his acquittals on the same offenses on which the defendants now rely -- conspiracy to violate § 666 and a Travel Act violation based on § 666 -- barred his future prosecution for conspiracy to violate the Travel Act in furtherance of a § 666 violation.  See id. at 33-34.

To resolve Bravo's collateral estoppel argument, we decided we needed to determine what "racketeering" activity the jury had decided Bravo engaged in when the jury convicted him of conspiracy to violate the Travel Act.  Id. at 34.  And the two possibilities we identified were a § 666 violation and a violation of Puerto Rico bribery law.  Id. at 29.  Only if the unspecified "racketeering" activity underlying the conviction had been based on a violation of Puerto Rico bribery law rather than of § 666 could Bravo succeed in pressing his collateral estoppel argument against being retried for conspiring to violate the Travel Act in furtherance of a § 666 violation.  See id. at 34.

-41-

Our inquiry into which of those offenses was the "racketeering" activity on which the vacated conspiracy conviction rested turned out to be an easy one. The jury had acquitted Bravo on the charge that he had conspired to violate § 666 and on the charge that he had violated the Travel Act in furtherance of a § 666 violation. Id. In contrast, the jury had convicted Bravo on the charge of violating the Travel Act in furtherance of a violation of Puerto Rico bribery law. Id.

Taking a "practical, realistic view" of the verdicts, we concluded from these other verdicts that Bravo's (facially ambiguous) conspiracy to violate the Travel Act conviction had been based on Puerto Rico bribery law violations, and not § 666. Only that conclusion, we explained, harmonized the verdicts without creating any inconsistency among them. Id. at 34. And, in consequence of that conclusion about what the jury had done, we concluded that the conspiracy to violate the Travel Act conviction -- at least if we assumed the jury had acted rationally -- did not contradict the acquittal on the Travel Act and conspiracy charges that had § 666 as a predicate offense. Id. We then held that the latter acquittals did collaterally estop Bravo's renewed prosecution for conspiring to violate the Travel Act in furtherance of violating § 666. Id.

Fernandez does show that the defendants' approach of using acquittals on separate counts to clarify the basis for an

-42-

ambiguous conviction has potential force. But the parties in
Fernandez did not raise, and so Fernandez did not address, the
question that is the crucial one in this appeal: whether the
conspiracy and Travel Act acquittals based on § 666 may be given
any collateral estoppel effect at all given their inconsistency
with the standalone § 666 convictions.

The government made no such argument in Fernandez.
Rather, the government's sole Powell-based argument in Fernandez
was the contention that Powell showed that Bravo's conviction for
conspiracy to violate the Travel Act was still valid even if that
conviction was inconsistent with other verdicts. And so, in
concluding that the § 666-based conspiracy and Travel Act
acquittals precluded a future prosecution for conspiracy to violate
the Travel Act, our analysis did not address the standalone § 666
convictions, or their relevance to the collateral estoppel effect
that the § 666-based Travel Act and conspiracy acquittals should be
given.

In this case, by contrast, the government squarely raises
the argument that, under Powell, the convictions on the standalone
§ 666 counts are inconsistent with the acquittals on the § 666-
based conspiracy and Travel Act charges, and thus deprive those
acquittals of the collateral estoppel effect that the defendants
ask us to give them. And so we have been obliged to consider the
effect of the standalone § 666 convictions. As we have explained,

however, those convictions, unlike the conviction for conspiracy to violate the Travel Act based on unspecified "racketeering" activity at issue in Fernandez, cannot be reconciled with the jury's decision to acquit on at least the § 666-based Travel Act offense. Our earlier discussion of the jury instructions and the parties' arguments shows why.

In consequence of this conflict in the verdicts, we may not speculate that the facially inconsistent verdicts nonetheless necessarily reflect a rejection of § 666 exchange-theory liability, when they equally could reflect a finding of such liability. See Powell, 469 U.S. at 66. Our consideration of the convictions therefore prevents us from concluding that there is an available consistent reading of all of the jury's verdicts that would lead us to give the collateral estoppel effect to the Travel Act and conspiracy acquittals based on § 666 that the defendants now seek in this appeal. We therefore affirm the District Court's denial of the defendants' motion for a judgment of acquittal.

**V.**

That brings us to the defendants' final, separate double jeopardy argument. This argument relies on the District Court's October 25, 2013, line order. The District Court entered that line order two days after this Court's mandate in Fernandez issued. The line order directed entry of a judgment of acquittal on the standalone § 666 counts. The defendants thus contend that this

line order constituted an irreversible acquittal of the defendants of those counts under the Double Jeopardy Clause.

The defendants base this challenge on the well-established rule that "the Double Jeopardy Clause bars retrial following a court-decreed acquittal, even if the acquittal is 'based upon an egregiously erroneous foundation.'" Evans v. Michigan, 133 S. Ct. 1069, 1074 (2013) (quoting Fong Foo v. United States, 369 U.S. 141, 143 (1962)). And that rule, the Supreme Court has held, prohibits even the court that entered a judgment of acquittal from reconsidering that judgment under at least some circumstances. See Smith v. Massachusetts, 543 U.S. 462, 469-75 (2005).

Whether an order counts as an "acquittal," however, is a question of substance and not of name.[12] See Evans, 133 S. Ct. at 1078. The determinative question is thus "whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." United States v. Martin Linen Supply Co., 430 U.S. 564, 571 (1977).

---

[12] The government does not argue in this case that the October 25 order lacked double jeopardy effect because that order was entered before a new jury had been sworn following this Court's remand. Cf. United States v. Tobin, 552 F.3d 29, 31 (1st Cir. 2009) ("[J]eopardy (here, after a vacatur of a conviction and a remand) does not attach until a jury has been sworn."). We therefore do not address that issue.

-45-

Here, the District Court's October 25 line order is not an acquittal under the substantive test that Evans and Martin Linen require that we apply. In Martin Linen, the Supreme Court found an acquittal where the district court ruled for the defendant on a motion for judgment of acquittal that the defendant made under Federal Rule of Criminal Procedure 29(c). 430 U.S. at 571-72. The district court had "plainly granted the Rule 29(c) motion on the view that the Government had not proved facts constituting criminal contempt." Id. at 572. It was thus "plain that the District Court . . . evaluated the Government's evidence and determined that it was legally insufficient to sustain a conviction." Id.

No such evaluation by the District Court is "plain," or even hinted at, by the record in this case. The line order itself states that it was entered "in accordance with" this Court's mandate. That statement suggests that the line order was merely intended as a ministerial act to carry out this Court's instructions -- whatever they may have been -- and not an application of law to fact regarding the defendants' "lack of criminal culpability." Evans, 133 S. Ct. at 1077 (quoting United States v. Scott, 437 U.S. 82, 98 (1978)). For that reason, the line order does not amount to a substantive acquittal by the District Court under Evans and Martin Linen.

The District Court confirmed as much in its opinion denying the defendants' motion to reinstate that order. The

District Court characterized the line order's reference to acquittals -- in carrying out this Court's mandate -- as "an error of transcription, not an error of law."  The District Court further explained that "[t]he very use of a line order, which contained no analysis and indicated the Court's mere intent to follow the First Circuit Court of Appeals' directives, exemplifies that the [District] Court did not intend to sua sponte acquit defendants of the section 666 charges."  And the circumstances of the order -- which came immediately after this Court's mandate, and unprompted by any party and thus not in response to an acquittal motion -- are consistent with the District Court's characterization of its line order.[13]  We thus conclude that the District Court's line order did not constitute an acquittal under the Double Jeopardy Clause, and

---

[13]  We note that the defendants do not identify any action they took in their cases in reliance on the District Court's order before the District Court vacated it.  See Smith, 543 U.S. at 474 ("Double-jeopardy principles have never been thought to bar the immediate repair of a genuine error in the announcement of an acquittal, even one rendered by a jury."); United States v. Hill, 643 F.3d 807, 867 (11th Cir. 2011) (reconsideration permitted where "[n]othing was done, or could have been done, in reliance on the acquittal ruling between the time that ruling was announced and the time it was rescinded"); United States v. Lucas, 516 F.3d 316, 338 (5th Cir. 2008) (no double jeopardy violation where the district court granted acquittals and then, after a weekend recess, changed its mind, as reconsideration came "before the trial progressed any further").  Nor could the defendants possibly do so, as nothing happened in the District Court in the interim.  We also need not consider here whether a concrete showing of reliance unconnected to the proceedings themselves could be relevant to our analysis, as the defendants have not made any such showing here.

thus the Double Jeopardy Clause did not prevent the District Court from reconsidering it.[14]

## VI.

For the foregoing reasons, the District Court's denials of the defendants' motions to "reinstate" the October 23 line order and to enter a judgment of acquittal on the standalone § 666 counts are affirmed.

---

[14] The defendants contend that the District Court lacked authority under Federal Rule of Criminal Procedure 36 to reconsider its line order. That Rule allows courts to correct "at any time . . . a clerical error . . . arising from oversight or omission." Fed. R. Crim. P. 36. But whether or not Rule 36 applied in this context, district courts have the inherent authority to reconsider their interlocutory orders outside the sentencing context. See, e.g., United States v. Aguirre, 214 F.3d 1122, 1124 (9th Cir. 2000) ("[D]istrict courts generally have 'inherent authority' to decide motions for reconsideration and rehearing of orders in criminal proceedings." (quoting United States v. Barragan-Mendoza, 174 F.3d 1024, 1028 (9th Cir. 1999))). In any event, the defendants' Rule 36 argument is not grounded in the Double Jeopardy Clause, and so we lack appellate jurisdiction to address that argument in this appeal. See Abney v. United States, 431 U.S. 651, 663 (1977); see also United States v. MacDonald, 435 U.S. 850, 860 n.7 (1978) ("Admittedly, there is value -- to all but the most unusual litigant -- in triumphing before trial, rather than after it, regardless of the substance of the winning claim. But this truism is not to be confused with the quite distinct proposition that certain claims (because of the substance of the rights entailed, rather than the advantage to a litigant in winning his claim sooner) should be resolved before trial.").