In the Supreme Court of Georgia

Decided:   May 23, 2016

S16A0256.  GIDDENS v. THE STATE.

NAHMIAS, Justice.

Appellant Matdrick Giddens was found guilty of five crimes, including two counts of felony murder, in connection with the shooting death of Timothy Murray, Jr.  After the trial court granted Appellant's motion for new trial based on two instructional errors, he filed a plea in bar seeking dismissal of the case based on his constitutional protection against double jeopardy.  The trial court denied the plea in bar, and Appellant now appeals that ruling.  He argues that the evidence at his trial was insufficient to support the guilty verdicts and that collateral estoppel bars the State from retrying him for the crimes of which he was found guilty, because he was acquitted of the aggravated assault count that is a predicate element of all of those crimes.

We conclude that the evidence was sufficient to support the guilty verdicts.  As for the collateral estoppel issue, we note that the United States Supreme Court recently granted certiorari to decide this very question, which

has divided the lower courts. See United States v. Bravo-Fernandez, 790 F3d 41 (1st Cir. 2015), cert. granted, No. 15-537, 2016 WL 1173125 (U.S. Mar. 28, 2016). Unfortunately, that decision will come down after our two-term deadline for deciding this case, see Ga. Const. of 1983, Art. VI, Sec. IX, Par. II, so we must work through the constitutional question. After doing so, we join the majority position and reject Appellant's argument. We therefore affirm the trial court's judgment.[1]

---

[1] The crimes occurred on November 4, 2007. On August 20, 2008, Appellant, Eric Jackson, and Desmond Oliver were indicted in Dougherty County for felony murder (based on the aggravated assault of Murray), felony murder (based on participation in criminal street gang activity against Murray), aggravated assault (by shooting Murray), third degree cruelty to a child, second degree criminal damage to property, possession of a firearm during the commission of a felony (aggravated assault of Murray), affray, and three counts of participation in criminal street gang activity (based on affray, aggravated assault by shooting Murray, and possessing a firearm during the aggravated assault of Murray). Desmond Oliver entered a plea and was sentenced to 40 years, with the first 23 to be served in prison. Appellant and Jackson were tried together from March 9 to 12, 2009. The jury found Appellant guilty of both felony murder charges, the firearm charge, and two of the gang activity charges (based on the aggravated assault and firearm possession); it acquitted Appellant of the remaining charges, including the aggravated assault count. The trial court sentenced Appellant to life imprisonment for felony murder based on aggravated assault, ten consecutive years for each of the gang activity convictions, and five consecutive years for the firearm offense; the other felony murder count was vacated by operation of law. On March 13, 2009, Appellant filed a motion for new trial, which he amended with new counsel on June 18, 2013. The trial court held an evidentiary hearing on July 26, 2013, and on February 7, 2014, the court granted a new trial as to all charges for which Appellant had been found guilty on the grounds that the court committed reversible error at trial by giving an incorrect instruction on participation in criminal street gang activity and by failing to give an instruction on the law of justification as Appellant had requested. On March 14, 2014, Appellant filed a plea in bar seeking the dismissal of all remaining charges against him, which the trial court denied in a summary order on May 15, 2015. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the January 2016 term and submitted for decision on the briefs.

2

1.     Appellant's first argument is that the evidence at his trial was legally insufficient to support the guilty verdicts the jury returned, which would bar a retrial on those charges as a matter of double jeopardy.  See Burks v. United States, 437 U.S. 1, 18 (98 SCt 2141, 57 LE2d 1) (1978).  This argument is meritless.

(a)     Viewed in the light most favorable to the verdicts, the evidence at trial showed the following.  Testimony from a gang investigator, who was qualified as an expert, showed that the 8 Tray Crips and the CME Rattlers were rival criminal street gangs operating in Albany, Georgia.  In late 2007, their rivalry erupted into deadly violence.  Around 10:30 p.m. on October 25, a Rattlers member was shot, and Crips members, including Desmond and Dante Oliver, were suspected.  About two hours later, a house belonging to the grandmother of the Olivers and Murray, who was also a Crips member, was shot at from a passing car.  Ten days later, on November 4, Rodreges Strum, a Rattlers member, was seen walking near the house that had been targeted.  The Olivers confronted Strum about the drive-by shooting.  Strum told the Olivers that he would "be back with my CME [Rattlers] boys."

Both gangs then rallied their members for a fight.  Murray and Appellant,

who was also a Crips member, were among those called to the Olivers' side. Murray was already at the house; Appellant was brought there by another Crips member. Strum returned to the house in a Chevrolet Tahoe, bringing Eric Jackson and other Rattlers with him. When they arrived and got out of the vehicle, fist fights began between the gang members. Ronald Taylor, a Rattlers member, then arrived in a car with three other people, one of whom was a child. Taylor left the car and joined in the fist fighting. There is no evidence that Appellant engaged in any fist fighting. At some point during the skirmish, Jackson returned to the Tahoe, retrieved a revolver, and began to fire, shooting first into the air and then toward the area where Murray and others were running. Appellant, who came from behind the house with a revolver or a 9mm gun, and Desmond Oliver, who had been involved in the fist fighting and had a .25-caliber handgun, returned fire.[2] Appellant shot in the direction of both Jackson, who was standing in the middle of the street, and Murray, who was in

---

[2] Dante Oliver, who pled guilty to participation in criminal street gang activity, acknowledged at trial that he had given an initial statement saying Appellant had a revolver, but he testified that he believed Appellant actually had a 9mm gun, not a revolver. There was some evidence that there were more than three shooters, including testimony from one witness that two or three people coming from behind the house had guns. Dante Oliver also originally told the police that Jerry Harris, a Crips member, had a gun, but he testified at trial that Harris did not have a gun.

4

a crowd across the street. At some point during this gun fight, a .38 caliber bullet fired from a revolver struck Murray in the head, killing him. No guns were recovered from the scene, but two 9mm shell casings were found near the house.

(b) The evidence presented at trial and summarized above was legally sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was found guilty, at least as a party to the crimes. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); OCGA § 16-2-20 (defining parties to a crime). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)). In particular, even if Appellant did not intend to shoot his fellow gang member Murray, "[f]rom the circumstances proven in this case, a rational jury could have inferred that [Appellant] shared a common criminal intent with [the other shooters] to engage in a gunfight in the presence of [others]," and thus "the evidence was sufficient for a rational trier of fact to find that [Appellant] was a party to the crime[s] . . . under the doctrine of transferred intent." Coe v. State, 293 Ga. 233, 235 (748

5

SE2d 824) (2013).

Relying on Rodriguez v. State, 284 Ga. 803 (671 SE2d 497) (2009), Appellant argues that even if there was sufficient evidence that he was a party to the aggravated assault of Murray, his conviction for criminal street gang activity based on that aggravated assault was improper because being a party to gang activity is not sufficient for a conviction of that offense. OCGA § 16-15-4 (a) provides that it is unlawful for a person associated with a criminal street gang "to conduct or participate in criminal gang activity through the commission" of any offense enumerated in § 16-15-3 (1), which includes aggravated assault. Rodriguez explained that a defendant cannot be convicted for merely being associated with a gang that commits criminal acts; the defendant must personally commit an enumerated offense himself. See 284 Ga. at 807. But nothing in the gang statute changes the ways in which a criminal offense can be committed, and OCGA § 16-2-20, defining parties to a crime, says that "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." Accordingly, because the evidence at trial was sufficient to prove that Appellant personally committed the offense of aggravated assault by at least being a party

6

to that offense, he could properly be convicted of participation in criminal gang activity based on that offense.

2. Appellant's second argument is that principles of collateral estoppel derived from the constitutional protection against double jeopardy bar the State from trying him again, because he was acquitted of the aggravated assault that is a predicate for each of the five crimes of which he was found guilty. Appellant was acquitted of aggravated assault by shooting Murray, and he is correct that, as they are alleged in the indictment, all of the crimes for which the State seeks to retry him require proof of that same aggravated assault: felony murder based on the aggravated assault, felony murder based on criminal street gang activity based on the aggravated assault, criminal street gang activity based on the aggravated assault, criminal street gang activity based on possessing a firearm during the commission of the aggravated assault, and possession of a firearm during the commission of the aggravated assault.

Determining how Appellant's acquittal of the underlying offense affects his retrial for crimes of which he was initially found guilty is an issue that, as mentioned earlier, the United States Supreme Court has announced that it will authoritatively decide, but not in time for the decision we must render in this

7

case.  We instead look for guidance to a trio of the Supreme Court's previous collateral estoppel decisions, as well as the decisions that other appellate courts around the country have reached on this question.

(a)    We begin with Ashe v. Swenson, 397 U.S. 436 (90 SCt 1189, 25 LE2d 469) (1970), where the Supreme Court first held that the rule of collateral estoppel "is embodied in the Fifth Amendment guarantee against double jeopardy," which is applied to the states through the Fourteenth Amendment.  Ashe, 397 U.S. at 445.[3]  Under this doctrine, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."  Id. at 443.  The protection against double jeopardy fundamentally protects against a second prosecution for the same offense after acquittal.  See Schiro v. Farley, 510 U.S. 222, 229 (114 SCt 783, 127 LE2d 47) (1994).  Ashe extended this principle by applying collateral estoppel to preclude retrial of the factual

---

[3]  By the time of Ashe, the Court noted, "collateral estoppel ha[d] been an established rule of federal criminal law" for at least 50 years.  397 U.S. at 443.  The doctrine is similarly longstanding under Georgia law.  See Harris v. State, 193 Ga. 109, 121 (17 SE2d 573) (1941) ("'[T]he plea of former acquittal may be sustained by showing that the defendant could not have been guilty of the crime with which he is now charged without also being guilty of that of which he has been acquitted.'" (citation omitted)).

8

decisions that necessarily underlie the legal determination of acquittal. See

United States v. Kramer, 289 F2d 909, 916 (2d Cir. 1961) ("The very nub of

collateral estoppel is to extend res judicata beyond those cases where the prior

judgment is a complete bar."). To effectuate this preclusion, the defendant has

the burden of proving from the record what facts were "actually and necessarily

decided in [his] favor." Schiro, 510 U.S. at 236.[4]

---

[4] Although collateral estoppel can apply both offensively and defensively in the civil context, see Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 333-338 (99 SCt 645, 58 LE2d 552) (1979), most courts have refused to apply collateral estoppel offensively against the defendant in criminal cases. See, e.g., State v. Scarbrough, 181 SW3d 650, 655-657 (Tenn. 2005) (explaining that the Eight Circuit's upholding offensive collateral estoppel to prove alienage in a criminal case is "a decidedly minority view in the federal appellate courts" and that "[s]everal well-reasoned state court decisions have likewise rejected the use of collateral estoppel against a defendant"). See also United States v. Pelullo, 14 F3d 881, 890-898 (3d Cir. 1994) (collecting and analyzing cases). Other courts have assumed that collateral estoppel would not apply offensively. See, e.g., Ashe, 397 U.S. at 464-465 (Burger, C.J., dissenting) ("[C]ourts that have applied the collateral-estoppel concept to criminal actions would certainly not apply it to both parties, as is true in civil cases[.]"). This resistance to the use of collateral estoppel against defendants in criminal cases makes sense because Ashe applied collateral estoppel as a component of the Double Jeopardy Clause of the Fifth Amendment, which protects persons, not governments. See Pelullo, 14 F3d at 891 (explaining that the few courts that have "ventured to apply collateral estoppel against the accused have grounded their holding on a perception of 'wise public policy and common sense judicial administration,'" rather than on the constitutional mandate announced in Ashe). Most courts that have considered the public policy arguments in favor of offensive collateral estoppel have concluded that these interests are outweighed by the defendant's due process rights, especially the rights to a jury trial and the presumption of innocence. See, e.g., Pelullo, 14 F3d at 894-895; State v. Ingenito, 432 A2d 912, 915-917 (NJ 1981). See also United States v. Harnage, 976 F2d 633, 635-636 & n.2 (11th Cir. 1992) (concluding that interests of judicial economy do not weigh in favor of the government's use of collateral estoppel in criminal cases and so declining to decide the due process implications). The issue before this Court today, however, is not what preclusive effect the facts decided by criminal convictions may carry, but rather what effect such facts have on the question of what facts were actually decided by acquittals in the same case (which would have preclusive force under Ashe).

9

The answer is not always clear from the face of the verdict. For example, in Ashe, the defendant was acquitted of robbing one victim at a poker game; he was then tried for robbing another victim at the same game. See 397 U.S. at 438-439. Looking merely at the legal judgment of acquittal, the fact that the defendant did not rob one man does not mean that he did not rob another. However, an examination of the evidence presented at the first trial showed that the proof of the robbery of both victims at the game was unassailable and the same for both victims, but the evidence that the defendant was one of the robbers was weak. See id. at 438. Thus, the acquittal in the first case established that the jury found that the defendant was not one of the robbers. See id. at 445. Because the question of the defendant's participation in the robbery had already been clearly and conclusively decided by the jury in his favor, it could not be relitigated. See id. at 445-446. See also Harris v. State, 193 Ga. 109, 121 (17 SE2d 573) (1941) (explaining that because the defendant's first trial for murder "centered upon the one single question [of] whether [he] participated with another in the murder and robbery of the deceased," by acquitting him of murder, "the jury necessarily found that he did not participate" in the robbery).

10

Thus, rather than merely examining the verdict, to determine the preclusive effect of an acquittal the court must "'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" Ashe, 397 U.S. at 444 (citation omitted). See also Phillips v. State, 272 Ga. 840, 841 (537 SE2d 63) (2000) (citations omitted).

Ashe dealt with the collateral estoppel effect on a retrial of a single verdict of acquittal, but it called into question some of what the Supreme Court had said in Dunn v. United States, 284 U.S. 390 (52 SCt 189, 76 LE 356) (1932), which addressed inconsistent verdicts in the same trial – a guilty verdict that is logically and factually inconsistent with a not guilty verdict. In Dunn, the Court held that a guilty verdict will not be vacated simply because it is inconsistent with an acquittal that was returned in the same trial. See id. at 393. In explaining this conclusion, the Court noted that if the defendant had been separately tried for the same offenses, "an acquittal on one could not be pleaded as res judicata of the other." Id. That statement, of course, does not survive Ashe. But in United States v. Powell, 469 U.S. 57 (105 SCt 471, 83 LE2d 461)

11

(1984), the second major precedent guiding our analysis in this case, the Supreme Court concluded that "the Dunn rule rests on a sound rationale that is independent of its theories of res judicata." Powell, 469 U.S. at 64. The Court explained that enforcing truly inconsistent verdicts returned by the same jury is appropriate because the inconsistency prevents the reviewing court from determining which verdict should be discarded. See id. at 68.

"'The most that can be said [about an inconsistent verdict] is that [it] shows that either in the acquittal or the conviction the jury did not speak their real conclusions.'" Id. at 63 (quoting Dunn, 284 U.S. at 393). And while the defendant might like to "assume[] that the acquittal on the predicate offense was proper – the one the jury 'really meant[,]' [t]his, of course is not necessarily correct; all we know is that the verdicts are inconsistent." Id. at 68. Put simply, once the inconsistency of the verdicts is established, "principles of collateral estoppel – which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict – are no longer useful." Id.[5]

_____

[5] In Milam v. State, 255 Ga. 560, 562 (341 SE2d 216) (1986), this Court followed Powell and abolished the inconsistent verdict rule in criminal cases as a matter of Georgia law. "Inconsistent" verdicts of guilty and not guilty are distinguished from "mutually exclusive" verdicts where the jury returns all guilty verdicts as to crimes that are logically and legally exclusive of each other. See State v. Springer, 297 Ga. 376, 377-382 (774 SE2d 106) (2015). See also Powell, 469

12

The final precedent that is invoked in this context is <u>Yeager v. United States</u>, 557 U.S. 110 (129 SCt 2360, 174 LE2d 78) (2009), where the Supreme Court clarified that "hung" verdicts should play no role in the examination of the record directed by <u>Ashe</u>. See <u>Yeager</u>, 557 U.S. at 116. In <u>Yeager</u>, the jury reached verdicts of acquittal on some counts but hung – could not reach a unanimous decision – on the remaining, factually related counts, resulting in a mistrial as to those counts. See id. at 115. The government argued that because the acquittals rationally mandated a verdict of acquittal on the hung counts, the jury's verdicts were inconsistent and irrational (as in <u>Powell</u>), and it was therefore impossible to discover what the jury necessarily decided; thus, the defendant could be retried on the hung counts. See id. at 124.

The Court rejected that reasoning, explaining that the jury's hung verdicts were not evidence of jury irrationality because "the fact that a jury hangs is evidence of nothing – other than, of course, that it has failed to decide anything." Id. at 125.

> A hung count is not a "relevant" part of the "record of [the] prior proceeding." See <u>Ashe</u>, [397 U.S. at 444]. Because a jury speaks

U.S. at 69 n.8.

13

only through its verdict, its failure to reach a verdict cannot – by negative implication – yield a piece of information that helps put together the trial puzzle. A mistried count is therefore nothing like the other forms of record material that Ashe suggested should be part of the preclusion inquiry.

Yeager, 557 U.S. at 121. Put another way, "[t]o identify what a jury necessarily determined at trial, courts should scrutinize a jury's decisions, not its failure to decide." Id. at 122.

(b)    We turn now to the issue presented by Appellant – what role an acquittal that is inconsistent not with a hung verdict, but rather with a conviction that subsequently was vacated due to trial error, should play in the collateral estoppel analysis. Since Yeager, several appellate courts around the country have addressed this exact issue; unhelpfully, neither Appellant nor the State has cited or analyzed this body of case law.[6] Three of those courts have explained that convictions are materially different than hung counts and have unanimously decided that where (as here) a retrial is granted based on trial error, the defendant can be retried on convictions that were inconsistent with acquittals. See Bravo-Fernandez, 790 F3d at 60; Evans v. United States, 987

_____

[6] We remind our bar that, particularly on questions of federal constitutional law, there are often relevant and persuasive precedents to be found beyond just the United States and Georgia Reports.

14

A2d 1138, 1142 (D.C. 2010); State v. Kelly, 992 A2d 776, 789 (N.J. 2010).[7] In a 4-3 decision, the Michigan Supreme Court went the other way, barring the retrial of a felony murder conviction after it was reversed for trial error, because the defendant was acquitted of the predicate felony. See People v. Wilson, 852 NW2d 134, 136 (Mich. 2014).[8] We now join the majority of these courts (as well as the dissent in Wilson) and conclude that a defendant's retrial for

---

[7] Two other federal circuits decided this question before Yeager, reaching the same conclusion that inconsistent convictions and acquittals do not bar retrial on the convictions. See United States v. Citron, 853 F2d 1055, 1062 (2d Cir. 1988); United States v. Price, 750 F2d 363, 366 (5th Cir. 1985). Notably, both opinions distinguished situations where the jury could not reach a decision on some counts and thus had spoken only through acquittals (as in Yeager) from situations with convictions that were inconsistent with acquittals. See Citron, 853 F2d at 1059; Price, 750 F2d at 366. See also Simpson v. Lockhart, 942 F2d 493, 496 (8th Cir. 1991) ("'[A]n inconsistent verdict cannot be used to establish collateral estoppel and thereby bar retrial under the double jeopardy clause[.]'" (citation omitted)). Another federal circuit recently ruled on federal habeas review that it was not unreasonable for the Oklahoma Court of Criminal Appeals to hold that inconsistent verdicts prevented the defendant from establishing the preclusive effect of the acquittal. See Owens v. Trammell, 792 F3d 1234, 1250 (10th Cir. 2015). See also United States v. Bruno, 531 Fed. Appx. 47, 49 (2d Cir. 2013) (summary order following Citron).

[8] Two other state supreme courts have reached similar conclusions, but on somewhat different grounds. In State v. Montoya, 306 P3d 426 (NM 2013), the court barred the defendant's retrial after he was convicted of felony murder but acquitted of the lesser-included offense of second-degree murder. See id. at 432. The court did not explicitly consider what effect the conviction had on the collateral estoppel analysis, and, importantly, the conviction was reversed because the trial court failed to properly instruct the jury on an element of felony murder, while it properly instructed the jury on second-degree murder. See id. at 431. Thus, this instructional error, which applied to the conviction but not to the acquittal, could be an explanation for the apparent inconsistency between the verdicts. In State v. Halstead, 791 NW2d 805 (Iowa 2010), the court applied Iowa state law that, unlike Georgia and federal law, bars inconsistent verdicts. See id. at 816. The court reversed the inconsistent verdicts on this ground and then prohibited retrial on the guilty verdicts. See id.

15

convictions that have been reversed or vacated due to trial error is not barred by an inconsistent acquittal.

Although Yeager did not address this question, its analysis is instructive. The Supreme Court did not reject the proposition that the inconsistency of verdicts would affect the collateral estoppel analysis, instead rejecting the government's argument because there were no inconsistent verdicts in that case. See 557 U.S. at 124-125. The Court emphasized that "a jury speaks only through its verdict," and it recognized that a verdict (but not a failure to reach a verdict) is "a piece of information that helps put together the trial puzzle." Id. at 121. A verdict, of course, may be a conviction as well as an acquittal.

The majority in Wilson asserted that guilty verdicts that are vacated on appeal due to trial error cannot be brought "back to life," so the facts underlying the conviction effectively disappear and "[t]he only final adjudication the defendant carries into his second trial . . . is his acquittal." 852 NW2d at 140-142. In this way, it was argued, vacated convictions are just like the hung verdicts in Yeager. See Wilson, 852 NW2d at 141. This argument, however, improperly focuses on the *legal* effect of the vacated conviction rather than the *factual* determinations the jury actually made in returning the guilty verdict. See

16

id. at 126 (Markman, J., dissenting) (explaining that there is an important distinction "between giving effect to factual elements of a reversed conviction and giving continued legal effect to a reversed conviction").

"[V]acated convictions, unlike hung counts, *are* jury decisions, through which the jury *has* spoken." Bravo-Fernandez, 790 F3d at 51. Thus, in analyzing whether a jury's acquittal shows that the jury necessarily decided that the government failed to prove an element of the crime, the fact that the jury convicted the defendant of a crime requiring proof of the same element "would seem to be of quite obvious relevance, even though the convictions were later vacated." Id. at 50. The conviction may have been affected by reversible trial error, but it is still a decision by the jury, and Ashe directs the reviewing court to focus on what facts were actually determined by the jury, not on whether the determination was unmarred by legal error. See Harary v. Blumenthal, 555 F2d 1113, 1117 n.2 (2d Cir. 1977) ("The collateral estoppel requirement that an issue actually be determined in the prior proceeding . . . cannot be overlooked simply because [there was trial error]."). See also Burks, 437 U.S. at 15 ("[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its

17

case.").

The bedrock of collateral estoppel in criminal cases is that the court must determine, honor, and apply the facts that the jury actually and necessarily decided in the defendant's favor. So what facts were clearly decided by a jury that said through its verdicts that the defendant both did and did not commit a specific crime? Juries do not provide detailed accounts of their reasoning, and indeed are generally protected from inquiries into it. See Powell, 469 U.S. at 61; OCGA § 24-6-606 (b). Thus, determining what facts the jury decided often requires the court to infer from the record those facts a "rational jury" must have decided in order to return the verdicts it reached. Ashe, 397 U.S. at 444.

The whole collateral estoppel analysis is premised on the proposition that the jury acted rationally and lawfully. When an acquittal is not contradicted by a conviction, we can presume that the jury properly followed the trial court's instructions and reached its verdicts rationally based on the factual determinations necessary to those legal conclusions. See Powell, 469 U.S. at 66 ("Jurors, of course, take an oath to follow the law as charged, and they are expected to follow it."); Sampson v. State, 282 Ga. 82, 84 (646 SE2d 60) (2007) ("Qualified jurors are presumed to follow the instructions of the trial court.").

18

Where a jury has spoken through both acquittals and convictions and has said truly inconsistent things, the same obedience and rationality cannot be presumed. "The problem is that the same jury reached inconsistent results; once that is established principles of collateral estoppel – which are predicated on the assumption that the jury acted rationally and found certain facts in reaching its verdict – are no longer useful." Powell, 469 U.S. at 68. See also Standefer v. United States, 447 U.S. 10, 22 n.17 (100 SCt 1999, 64 LE2d 689) (1980) ("[I]nconsistency [in the verdicts] is reason, in itself, for not giving preclusive effect to the acquittals.").

Truly inconsistent verdicts reveal that the jury made a mis-step somewhere. Perhaps the jurors wanted to extend some leniency; perhaps they were confused or simply made a mistake; or perhaps they just compromised so they could go home. See Powell, 469 U.S. at 65; Thornton v. State, Case No. S15G1108, 2016 WL 1085391, at *4 (March 21, 2016). Whether the error is reflected in the acquittal or the conviction we cannot tell. See Powell, 469 U.S. at 65 ("Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored."). Thus, inconsistent

19

verdicts "give little guidance as to the jury's factual findings," meaning that the defendant cannot rely on the verdict helpful to him, and ignore the verdict harmful to him, to meet his burden of showing that his innocence was conclusively decided in the earlier trial. Evans, 987 A2d at 1142. See also Wilson, 852 NW2d at 147 (Markman, J., dissenting) ("[T]here is no way of determining whether such a jury has 'actually and necessarily decided the ultimate issue of fact.'"). For this reason, collateral estoppel will not apply to prevent retrial of a vacated conviction merely because it is inconsistent with an acquittal.

We add this point. Where there is no reversible trial error, it is well-settled that the United States Supreme Court and this Court will allow inconsistent verdicts to stand, meaning that the defendant will be sentenced – perhaps to life imprisonment – based on the inconsistent conviction. See, e.g., Powell, 469 U.S. at 64; Milam, 255 Ga. at 562. If we adopted Appellant's argument, a defendant who established reversible error as to the conviction would not just get a new trial; he would go free, because the acquittal that otherwise does nothing to bar enforcement of the conviction would suddenly extinguish the conviction. That would make little sense, and we are inclined to

reach sensible results.

(c)     Based on these principles, we must now examine the record in this case to determine if the verdicts returned by the jury in Appellant's original trial establish, as he argues they do, that the jury conclusively found that he did not commit aggravated assault by shooting Murray.  Such a finding is the only basis that a rational jury would have had for acquitting Appellant of the stand-alone aggravated assault charge.  The jury did acquit Appellant of aggravated assault – but it also convicted him of five crimes based on the same aggravated assault, and the record shows that there is no way that a rational jury could have found Appellant guilty of those crimes without also finding that he committed the aggravated assault.

Appellant contends that a rational explanation for the conflicting verdicts can be found in the jury instructions, and it is true that where "the verdicts may be reconciled by reference to the jury instructions and the arguments of counsel, then the 'assumption that the jury acted rationally and found certain facts in reaching its verdict' will be restored, and collateral estoppel principles will again be useful." Bravo-Fernandez, 790 F3d at 54.  Appellant argues first that the instructions allowed the jury to convict him of aggravated assault based on

any victim's apprehension of violent injury, rather than – as was indicted – based on the actual shooting of Murray. As Appellant points out, in charging the jury on the assault element of aggravated assault, the trial court instructed the jury on both forms of assault.[9] However, the court also charged the jury that the State was required to prove all material allegations in the indictment; the indictment was sent back with the jury; and the indictment clearly based the aggravated assault charge (and all the charges building on it) on Murray's shooting. This cured the overbroad offense instruction. See, e.g., Williams v. Kelley, 291 Ga. 285, 286-287 (728 SE2d 666) (2012).[10]

Furthermore, even if the jury believed that it could find Appellant guilty of aggravated assault based on Murray's (or any other gang member's) apprehension of injury, this would not harmonize the verdicts, because the aggravated assault instruction applied to all pertinent counts. There is no reason to believe that the jury convicted Appellant of the compound offenses based on

---

[9] Under OCGA § 16-5-20 (a), "A person commits the offense of simple assault when he or she either: (1) Attempts to commit a violent injury to the person of another; or (2) Commits an act which places another in reasonable apprehension of immediately receiving a violent injury."

[10] Nevertheless, the trial court should give a properly tailored instruction on assault at Appellant's new trial.

an incorrect understanding of aggravated assault while acquitting him of the predicate offense based on the correct understanding. In fact, before the trial court defined assault, it explained that there were "six references to the offense of aggravated assault," and the court gave no indication that the aggravated assault offenses were different for any of the six references. See Bravo-Fernandez, 790 F3d at 54 (explaining that the reversal of the convictions due to an improper instruction on the underlying offense did not make the jury's verdicts consistent, because nothing in the instructions tied the improper definition to the convicted counts alone).

Appellant also argues that the trial court's instruction on participation in criminal gang activity allowed the jury to find him guilty of those counts (as well as felony murder based on criminal gang activity) based only on evidence that he was in a gang and the gang engaged in activity that killed Murray. It is true that the court's instruction on those counts was quite vague, saying only, "[i]t shall be unlawful for any person associated with a criminal street gang to participate in criminal activity," and providing no definition of "criminal activity." And the State argued in closing that the jury should convict Appellant

if it believed that "he participated in gang activity and through that gang activity Timothy Murray was killed."

Again, however, the indictment made clear that Appellant was charged with participation in criminal street gang activity "through the crime of aggravated assault, to wit: said accused did shoot [Murray]" and "through the crime of possession of a firearm during the commission of a felony, to wit: said accused did possess a certain handgun during the aggravated assault of [Murray]." A rational jury would have followed the court's instruction that the State must prove every material allegation of the indictment and thus either disregarded the State's argument to the extent that it did not conform to the indictment, or harmonized the argument with the understanding that the "gang activity" that killed Murray and in which Appellant must have participated to justify conviction was the aggravated assault of shooting Murray. Moreover, Appellant's argument about the charges involving gang activity does nothing to reconcile his acquittal for aggravated assault with his conviction for felony murder based on the aggravated assault. For these reasons, any instructional error on this point does not render the verdicts consistent and give the acquittal

preclusive effect.[11]

In sum, the guilty and not guilty verdicts returned at Appellant's original trial show that the jury decided that he *did* and he *did not* commit aggravated assault by shooting Murray. Given these inconsistent and irrational verdicts, Appellant cannot rely on the fact that a rational jury would have had to find that he did not commit the aggravated assault in order to acquit him of that charge. He has failed to prove that collateral estoppel applies in this case, and the State may retry Appellant on the five vacated convictions.

Judgment affirmed. All the Justices concur.

---

[11] The trial court based its grant of a new trial in part on its conclusion that "the incorrect instruction on participation in criminal street gang activity was reversible error," but the court did not specify the error it perceived. In any event, the trial court's conclusion does not control our independent evaluation of whether the jury instructions provide a rational explanation for the conflicting verdicts. The trial court also ruled that it was "reversible error not to charge the jury on the law of justification." That ruling appears correct, but it does not provide an explanation for the jury's inconsistent verdicts, and Appellant does not argue that it does; a justification instruction would apply to all of the charges based on the aggravated assault.