313 Ga. 762
FINAL COPY

S22A0306.  GOODMAN v. THE STATE.

PETERSON, Justice.

Jemerius Goodman was convicted of felony murder and other

crimes in connection with the death of Jyleel Solomon and the

aggravated assaults of four other people.[1] On appeal, Goodman

[1] The crimes took place on November 6, 2017. Goodman was indicted by a Baldwin County grand jury alongside Malik Taylor and Brandon Walls on March 14, 2018. Counts 1-4 charged all three with Solomon's felony murder, predicated respectively on aggravated assaults with firearms charged in Counts 5-8. Each of Counts 5-8 specified a different victim — respectively, Malik Murray, Elijawon May, Brian Hitchcock, and Keonna Lewis. Count 9 charged Goodman with criminal use of an article (a pistol) with an altered identification mark (a removed serial number). Counts 10-12 charged Goodman with tampering by concealing physical evidence with the intent of obstructing the prosecutions of Taylor, Walls, and himself, respectively.

Walls pleaded guilty to voluntary manslaughter and aggravated assault. Goodman and Taylor were tried by a jury from November 6 to 13, 2018. The jury found both men guilty on all counts with which they were charged. Taylor's case is not part of this appeal. The trial court sentenced Goodman to life in prison on Count 4, 20 years to serve consecutively for each of Counts 5-7, five years on Count 9 to serve concurrently with Count 4, and ten years to serve on Counts 10-12 concurrently with Count 4, for a total of life in prison plus 60 years. The trial court noted that Counts 1-3 were vacated by operation of law, and it merged Count 8 into Count 4.

Goodman moved for a new trial on November 19, 2018. He amended the motion on September 23, 2019. The trial court denied it on July 23, 2021. Goodman timely filed a notice of appeal on July 28, 2021. The case was docketed to this Court's term beginning in December 2021 and submitted for a decision on the briefs.

argues that there was insufficient evidence presented at trial to support his convictions and the trial court erred in admitting statements he made after invoking his right to remain silent. But the evidence was sufficient, and Goodman never unambiguously invoked his right to remain silent. We reject Goodman's arguments and affirm, although we sua sponte vacate Goodman's void sentence for obstructing his own prosecution and remand the case for resentencing on that count.

1. *Background*

(a) *Solomon is killed during an exchange of gunfire.*

Viewing the trial evidence in the light most favorable to the verdicts, after nightfall on November 6, 2017, five friends — Keonna Lewis, her boyfriend Brian Hitchcock, Elijawon May, and brothers Malik ("Malik") and DeMarquis Murray — were socializing outside the Murrays' home. A white car passed by. The occupants were Brandon Walls, Solomon, Goodman, and Malik Taylor ("Taylor"). Taylor was driving, and Goodman was in the front passenger seat.

Gunfire erupted. The first shots came from the white car.

Solomon was firing an AK-47 rifle from one of the rear seats. He was hit in the face by a shot fired from the yard by Malik and pronounced dead later that night. Lewis saw someone shooting across the car while hanging out the front passenger side. Lewis was shot in the pelvic area. Walls told the police he "did not see Goodman firing . . . , but felt that he had," as he heard shots to his right.

Solomon later received medical attention and, while he was still conscious, tried to talk to first responders, but was largely unintelligible. He was pronounced dead soon after arriving at the hospital. His autopsy revealed that he had died of the gunshot wound, with a bullet fracturing his skull and fragmenting in his brain. The medical examiner testified that "[a]ny volitional or conscious movement or effort," including talking, would have ceased upon Solomon's being shot, but cardiac and respiratory activity may have continued until death.

(b) *The guns are discarded.*

Walls told the police that Goodman took the firearms. Walls testified that he gave Goodman two firearms when Goodman said,

3

"I need to duck all the fires," which Walls took to mean that Goodman would discard the weapons. Walls told the police where they could find Goodman and that Goodman likely had the guns. Police searched Goodman's mother's car trunk and found a 9mm handgun in a book bag, as well as a .38-caliber revolver. The revolver's serial number had been filed off. Ballistic examination revealed that the 9mm handgun fired both the shot that hit Lewis and a casing that was recovered from Taylor's pocket. Police found an AK-47 at Solomon's home.

(c) *Goodman writes an incriminating jail note.*

In jail, Taylor received a note urging him to accept responsibility for one charge in exchange for the sender admitting to another. It read that "Brant"[2] could incriminate the note's author, Brant would meet with consequences for doing so, Taylor should deny that the author was present during the shooting, there was no need for "both of us" to go down, and "[w]e started dis." The note also

---

[2] Walls testified that "Grant" was his nickname. Malik identified Walls as "Brant" in his trial testimony.

gave the author's "story," which was that he was dropped off when Solomon was picked up and later received the guns when a bag holding them was thrown out of a car window. The note was signed, "Madd Maxx." Goodman had a Facebook profile in the name of "Mad Max" and had that name tattooed on his hands, and Walls at one point told the police that someone he knew from Facebook as "Mad Max" got out of the car and ran with the guns. A jail dorm mate and acquaintance of Goodman read the note and recognized the handwriting as Goodman's, having seen him write an earlier message. The State also introduced jail paperwork together with testimony that the handwriting on them was Goodman's.

(d) *Goodman's police statement is admitted against him.*

Goodman was interviewed separately by two different detectives, Robert Butch and T. J. Hargrove. An incriminating statement Goodman made to Detective Hargrove was admitted at trial.[3] Goodman's counsel stipulated that Goodman was in custody

---

[3] Whether Goodman's statement to Detective Butch was played for the jury is not entirely clear from the record.

for both interviews and validly waived his *Miranda* rights.[4] The only issue with the statement that Goodman raised in the trial court and raises here is whether he invoked his right to remain silent while talking to Detective Butch, making his subsequent statement to Detective Hargrove inadmissible.

In the midst of a heated and far-ranging discussion with Detective Butch about Goodman's sense of futility in working with the police, the following exchange took place:

> GOODMAN: You gotta allow people to be who they are. You feel me. You can't change that. So ain't no use in trying—
> DETECTIVE BUTCH: I can't change anybody. I can't change anybody. I can only change me.
> GOODMAN: So, like, I already told you, you're wasting your time talking to me. I'm not going to change my mind about anything I said. I'm not—***I don't want to talk to you. I don't want to talk to you.*** I don't want your paper. I don't give a f**k about this s**t. Like, bro, I don't wanna think about my partner being dead, something's gotta be done!
> DETECTIVE BUTCH: Something's gotta be done about it.
> GOODMAN: But not what you talking about.
> DETECTIVE BUTCH: . . . help me do something about it.
> GOODMAN: Bro, I don't need y'all help, bro.

---

[4] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

DETECTIVE BUTCH: Sure you do. Then why do you b\*\*ch about us not doing our jobs?

(Emphasis added.)

Five minutes later, the two exchanged the following words:

DETECTIVE BUTCH: Yeah! Malik told us he carries a tool. Malik carries—he told us he carries a tool.
GOODMAN: Right, look—
DETECTIVE BUTCH: Your partner always carries a tool.
GOODMAN: If he told you, [laughing] bro, he's just flexing bro, like, I mean, like, real life.
DETECTIVE BUTCH: Kind of what you're doing.
GOODMAN: On my soul, like, he's—
DETECTIVE BUTCH: Kind of like what you're doing.
GOODMAN: —he's always flexin'. He's gonna flex.
DETECTIVE BUTCH: Oh, like you are.
GOODMAN: I ain't, no, [unintelligible]. Bro, like I said, 'bout what's going on, bro, is what's going on. Like, I don't know about that. ***I don't want to talk***, and then, like, what's going to happen, it's going to happen regardless. Alright? Y'all know what's going on. Do y'all's job.
DETECTIVE BUTCH: We've been trying, but you ain't helping.
GOODMAN: Bro, I'm not going to help you do your job.
DETECTIVE BUTCH: You just want—
GOODMAN: I don't need y'all to go help me do my job. You feel? Unless y'all gonna take those badges off and ride with me—

(Emphasis added.) The two argued for another minute, and then

Detective Butch left.

The trial court found that Goodman did not unambiguously

invoke his right to remain silent; rather, "It sounded like it was more of a frustration between him and the topic and the detective because they did get rather heated back and forth. And . . . despite the fact that he kept saying that [he did not want to talk], he also kept talking." The court therefore admitted Goodman's subsequent statement to Detective Hargrove.

In that statement, Goodman claimed not to have been present during the shooting and denied seeing any guns in the car beforehand. He admitted that he drove his mother's car regularly. Pressed as to the ownership of the guns found in it, Goodman denied that they were his mother's or sister's. Detective Hargrove said they had to be Goodman's. Goodman responded, "I ain't going to say that, but, you can say that. You can say that." He then claimed that he received the guns when a car drove by and they were thrown out of the window in his book bag as someone yelled, "Get rid of them." Goodman said there was blood in the bag.

Goodman was convicted after arguing that he was not involved in the shooting and that he acted in self-defense even if he was.

2. *Analysis*

Goodman now contests the sufficiency of the evidence and the trial court's admission of his police statement. His arguments are unavailing, but we vacate an illegal sentence as to one count.

(a) *There was sufficient evidence of Goodman's guilt.*

Goodman first argues that the evidence of his guilt was insufficient as to all crimes except using an altered gun.[5] He asserts that there was insufficient proof that he fired any shots or was a party to the shooting, the jail note was not unambiguous evidence of guilt, neither Walls nor Ford was credible, and the medical examiner's testimony that Solomon would have immediately lost consciousness contradicts the first responders' testimony that Solomon tried to speak with them.

We reject Goodman's arguments. In considering a claim that

---

[5] Goodman does not challenge the sufficiency of the evidence that he committed criminal use of an article with an altered identification mark. We no longer review evidentiary sufficiency sua sponte, except that of murder convictions resulting in the death penalty. See *Davenport v. State*, 309 Ga. 385, 398-399 (4) (b) (846 SE2d 83) (2020). Accordingly, we do not address the sufficiency of the evidence as to that count.

9

evidence was insufficient in violation of his federal due process right under *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), "our review is limited to an evaluation of whether the trial evidence, when viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Howard v. State*, 307 Ga. 284, 286 (835 SE2d 605) (2019). We "put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." Id. (citation and punctuation omitted).

For this reason, we reject outright Goodman's arguments regarding the credibility of Walls and Ford, differences between what the medical examiner opined and what first responders reported, and the jail note's alleged ambiguity. Matters like these fall within "the province of the factfinder, not this Court." *Hampton v. State*, 272 Ga. 284, 285 (1) (527 SE2d 872) (2000).

Moreover, considering the evidence most favorably to the

10

verdicts, there was sufficient evidence to lawfully convict Goodman at least as a party to the shooting. A defendant is guilty as a party to a crime if he "[i]ntentionally aids or abets" it. OCGA § 16-2-20 (b) (3). "While mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense." *McGruder v. State*, 303 Ga. 588, 591 (II) (814 SE2d 293) (2018) (citation and punctuation omitted). There was evidence that Goodman was more than merely present for the felony murder of Solomon and the aggravated assaults of Malik, May, Hitchcock, and Murray. There was evidence that Goodman wrote a note to Taylor urging him to deny that Goodman was present and threatening repercussions against Walls. Indeed, the note described the same "story" of how Goodman got the guns as he told Detective Hargrove. Jurors can use such attempts to influence witnesses as evidence of consciousness of guilt. See *Bridges v. State*, 279 Ga. 351, 355 (6) n.16 (613 SE2d 621) (2000).

There was also evidence from Walls that Goodman disposed of

the guns after the shooting. Goodman argues that we should disregard this evidence, as he deems it uncorroborated accomplice testimony. See OCGA § 24-14-8 ("[I]n . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient."). But "although Georgia law requires independent corroboration of an accomplice's testimony to secure a conviction, federal law does not require such corroboration and, thus, a failure to corroborate accomplice testimony [does] not offend constitutional due process." *State v. Grier*, 309 Ga. 452, 456 (2) (847 SE2d 313) (2020).

Insofar as Georgia statutory law requires accomplice testimony to be corroborated in order to sustain a conviction, and assuming Goodman raises an argument that the statute was not satisfied, we conclude that there was adequate corroboration of Walls's statements. Even if Walls was the only witness to testify about Goodman's disposing of the guns, the jury was charged on the statutory corroboration requirement. As a matter of law, "only slight evidence of corroboration is required," and it need only "directly

12

connect[ ] the defendant to the crime or lead[ ] to the inference of guilt. The sufficiency of the corroboration is a matter for the jury to decide." *Montanez v. State*, 311 Ga. 843, 849 (1) (b) (860 SE2d 551) (2021) (citation and punctuation omitted). There was corroboration of Walls's statements: the gun that shot Lewis was found in a car Goodman drove regularly. Additionally, the jail note described the account Goodman gave to Detective Hargrove regarding how he got the guns as "my story," in the context of telling a witness what to say. This likewise was evidence that the jury could have found to corroborate Walls's statements (assuming the jury found Walls to be an accomplice in the first place).[6]

Taken as a whole, the evidence was sufficient as a matter of

---

[6] Neither Goodman's admission to Detective Hargrove regarding his use of the car nor the jail note was an uncorroborated confession, which is likewise an issue only under Georgia statutory law and not federal due process. See OCGA § 24-8-823 ("A confession alone, uncorroborated by any other evidence, shall not justify a conviction."). A confession is an admission to "the entire criminal act." *English v. State*, 300 Ga. 471, 474 (2) (796 SE2d 258) (2017) (citation and punctuation omitted). By contrast, admissions not requiring corroboration include "mere incriminating statement[s]" where the defendant, "though admitting to damaging circumstances, nonetheless attempts to deny responsibility for the crime charged by putting forward exculpatory or legally justifying facts." Id. (citation and punctuation omitted). Goodman did not confess to Detective Hargrove or in the jail note.

federal constitutional due process and of Georgia statutory law to support Goodman's convictions as a party to the shooting, even despite his claim of self-defense and his denial that he fired a weapon. See *Gibbs v. State*, 309 Ga. 562, 565 (847 SE2d 156) (2020) ("[T]he question of justification . . . is for the jury to decide."); *Giddens v. State*, 299 Ga. 109, 111 (1) (b) (786 SE2d 659) (2016) ("[E]ven if Appellant did not intend to shoot his fellow gang member Murray, from the circumstances proven in this case, a rational jury could have inferred that Appellant shared a common criminal intent with the other shooters to engage in a gunfight in the presence of others, and thus the evidence was sufficient for a rational trier of fact to find that Appellant was a party to the crimes under the doctrine of transferred intent." (citation and punctuation omitted)); *Jones v. State*, 250 Ga. 11, 13 (295 SE2d 71) (1982) (disposing of the murder weapon supported conviction as a party to the crime when taken together with involvement in acts leading up to the crime).

(b) *Goodman never clearly invoked his right to remain silent.* Goodman claims that he twice invoked his right to remain

14

silent during Detective Butch's interrogation, and thus the incriminating statements he made during a subsequent interrogation by Detective Hargrove must be suppressed. The District Attorney, but not the Attorney General, argues that this issue is unpreserved for our review. Even assuming that the issue was preserved, it is meritless, as Goodman never unambiguously invoked his right to remain silent. Although, as excerpted above, on two occasions about five minutes apart he said that he did not "want to talk," he focuses on those statements in a vacuum. Reviewing those statements in context, however, shows that Goodman continued talking without prompting from the detective and did not unambiguously invoke the right.

An exercise of the federal constitutional right to remain silent in the face of police questioning must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (96 SCt 321, 46 LE2d 313) (1975) (citation and punctuation omitted). But the right must be invoked "unambiguously." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (130 SCt 2250, 176 LE2d 1098) (2010) (citation and punctuation

15

omitted). A person under interrogation has to articulate a "desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Perez v. State*, 283 Ga. 196, 200 (657 SE2d 846) (2008) (citation and punctuation omitted). Such clarity is absent when a suspect makes an ambiguous statement in the midst of his plain acquiescence to continued questioning. See id. at 201.

Goodman did not unambiguously invoke his right to remain silent. After each time that Goodman told Detective Butch he did not want to talk — and before any further questions from Detective Butch — he said that he wanted the police to investigate Solomon's death. Goodman did not merely acquiesce in continued conversation. He prompted it. Cf. *Weaver v. State*, 288 Ga. 540, 544 (4) (705 SE2d 627) (2011) (holding suspect's statement, "I don't want to say nothing. There's just so much to say" was not unequivocal attempt to cut off questioning (punctuation omitted)); *Perez*, 283 Ga. at 200-201 (suspect's statement "I guess I can stop the interrogation" was

16

equivocal and if he "had truly intended to . . . invoke his right to remain silent, he would not have acquiesced in responding to the officer's further questioning" (punctuation omitted)). Goodman's words were just "part of the 'give and take' of interrogation" and an expression of his "internal conflict and pain." *Weaver*, 288 Ga. at 544 (4) (citation and punctuation omitted). Goodman did not invoke his right to remain silent, and the trial court did not err in admitting his later statement to Detective Hargrove.

(c) *The sentence as to Count 12 is illegal.*

Count 12 of the indictment charged Goodman with tampering with evidence with the intent of obstructing his own prosecution for felony murder, in violation of OCGA § 16-10-94. Goodman was convicted of this charge and sentenced to ten years, to be served concurrently with his sentence on Count 4. Goodman does not contest the sufficiency of the evidence as to this conviction, nor do we choose to consider it sua sponte. See *Davenport v. State*, 309 Ga. 385, 398-399 (4) (b) (846 SE2d 83) (2020). But we often do exercise our discretion sua sponte to vacate a sentence for the benefit of

17

defendants if we notice that it is void. See *Dixon v. State*, 302 Ga. 691, 697 (4) (808 SE2d 696) (2017) ("We have the discretion to correct merger errors sua sponte — regardless of who is harmed by the error and who benefits from its correction — because a merger error results in an illegal and void judgment of conviction and sentence. . . . [A]n exercise of our discretion on direct appeal to correct a merger error that harms a defendant (but of which he has not complained) may avoid unnecessary habeas proceedings and thereby promotes judicial economy.").

Goodman's sentence as to Count 12 is void. Our case law has interpreted OCGA § 16-10-94 (c) as authorizing a sentence of between one and ten years only if the tampering involves the prosecution of "another person." See *Byers v. State*, 311 Ga. 259, 268 (3) (857 SE2d 447) (2021).[7] Tampering with evidence for the purpose

[7] Some of us have doubts about the correctness of this case law. We appear to have developed this rule by importing uncritically the holding to this effect in *English v. State*, 282 Ga. App. 552, 553-556 (2) (639 SE2d 551) (2006). See *White v. State*, 287 Ga. 713, 717 (1) (d) (699 SE2d 291) (2010) (relying on *English*). Some of us view *English*'s statutory construction as weak, and the statutory language on which *English* relied (tampering "involving the

of obstructing one's own prosecution may be sentenced only as a misdemeanor. See *Byers*, 311 Ga. at 268 (3). We therefore vacate Goodman's sentence as to Count 12 and remand for resentencing regarding it.

*Judgment affirmed in part and vacated in part, and case remanded for resentencing. All the Justices concur.*

Decided May 17, 2022.

Murder. Baldwin Superior Court. Before Judge Burleson.

*Crawford & Boyle, Eric C. Crawford*, for appellant.

*T. Wright Barksdale, District Attorney, D. Brent Cochran, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.

---

prosecution or defense of a felony and involving another person," see OCGA § 16-10-94 (c)), may not obviously require *English*'s holding. But our case law is binding until overruled, this case presents a poor vehicle to reconsider it, and considerations of stare decisis might warrant retaining it in any event. Accordingly, we apply it faithfully here.